# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| The residence 3250 Pueblo Avenue Los Angeles, CA 90032 as described more fully in Attachment A-2 | ) ) ) ) | Case No. 2:22-MJ-3968 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(j) | Unlawful Possession or Sale of Any Stolen Firearm |
| 18 U.S.C. §§ 922(a)(1)(A) | Dealing in Firearms Without a License |
| 18 U.S.C. §§ 922(o) | Unlawful Possession of a Machinegun |
| 18 U.S.C. §§ 371 | Conspiracy |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Albert Shinfeld*

_____
*Applicant's signature*

Albert Shinfeld**,** Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Jeffrey Chemerinsky (x16520)

## **ATTACHMENT A-2**

<u>PREMISES TO BE SEARCHED</u>

The premises to be searched is located at 3250 Pueblo Avenue Los Angeles, CA 90032 (the "SUBJECT PREMISES"). The SUBJECT PREMISES, as depicted in the photograph below, is a single-family residence. The structure is located to the rear of 3252 Pueblo Avenue Los Angeles, CA 90032 at the intersection where Barstow St dead ends into Pueblo Avenue. The numbers "3250" are affixed on a white plaque and written in black writing above the front door. 3250 Pueblo Avenue Los Angeles, CA is a white stucco structure with gray shingles on the roof. The driveway sits on the south side of the structure and has a black wrought iron fence surrounding the property of 3252/3250 Pueblo Avenue. The front door has a security door affixed and is facing south. 3250 Pueblo Avenue has an unknown number of windows on the north, south, east, and west sides of the building. There also appears to be a garage and storage area at the end of the driveway to the rear of 3250 Pueblo Avenue.



i

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(j) (unlawful possession or sale of any stolen firearm), 18 U.S.C. §§ 922(a)(1)(A) (dealing in firearms without a license), 18 U.S.C. §§ 922(o) (unlawful possession of a machinegun), and 18 U.S.C. §§ 371 (conspiracy) (collectively, the "Subject Offenses"), namely:

      a.   Firearms and ammunition;

      b.   Firearms parts and accessories to include smokeless powder;

      c.   Evidence of illegal firearms sales;

      d.   Evidence of firearms sales, including dealer's record of sales documents;

      e.   Evidence of financial transactions derived from the illegal sales of firearms;

      f.   Buyer lists, seller lists, and recordation of sales documents;

      g.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

i

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

h. Documents and records, in print of digital format, reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of firearms, or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when firearms or ammunition were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

i. Documents, in print of digital format, of money transfers, digital payments to include cryptocurrency, and wire transfers to or from firearms, buyers and brokers;

j. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

k. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written

communications sent to or received from any of the digital
devices and which relate to the above-named violations;

        l.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

        m.    Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of firearms or ammunition;

        n.    Contents of any calendar or date book;

        o.    Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

        p.    Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offenses, and forensic copies thereof.

        q.    With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

        i.    evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

viii.    records of or information about
Internet Protocol addresses used by the device;

ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. The search team will not seize contraband or

evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a. Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress AASA's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of AASA's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Albert Shinfeld, being duly sworn, declare and state as
follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of an application
for a warrant to search the following individual, residence, and
two vehicles:

a.   The person of Chuck Leroy Aasa ("AASA"), as
described more fully in Attachment A-1;

b.   The residence 3250 Pueblo Avenue Los Angeles, CA
90032 (the "SUBJECT PREMISES") as described more fully in
Attachment A-2.

c.   The following two (2) vehicles, utilized by AASA:

i.   A white 2007 Dodge Nitro bearing California
license plate 8TVS709, registered to Priscilla Karay Petersen
("PETERSEN")[1] at the SUBJECT PREMISES ("SUBJECT VEHICLE 1"), as
described more fully in Attachment A-3

ii.   A gray 2007 Hyundai Santa Fe bearing
personalized California license plate "AASAFAM" ("SUBJECT
VEHICLE 2"), registered to AASA and PETERSEN (AASA's Spouse) at
the SUBJECT PREMISES, as described more fully in Attachment A-4.

2.   The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 18
U.S.C. §§ 922(j) (unlawful possession or sale of any stolen
firearm), 18 U.S.C. §§ 922(a)(1)(A) (dealing in firearms without

---

[1] Through talking with AASA and review of his cellphone,
PETERSEN has been identified as the wife of AASA.

a license), 18 U.S.C. §§ 922(o) (unlawful possession of a machinegun), and 18 U.S.C. §§ 371 (conspiracy), (collectively, the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, B, and C are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a Detective with the Los Angeles Police Department ("LAPD") and Task Force Officer[2] ("TFO") with the

---

[2] It is the policy of HSI that, pursuant to Title 19, United States Code (U.S.C.), Section 140 I (i), sworn LEOs from state, local, tribal, and foreign agencies may be designated as Customs Officers (Excepted) and authorized to perform the full range of law enforcement duties of a Customs Officer, as authorized by an HSI Special Agent in Charge ("SAC"). Cross-Designated TFOs may exercise this authority only when operating on behalf of HSI. Cross-designation augments, but does not affect or supplant, any authorities granted to TFOs by their parent agency.

In accordance with 19 U.S.C. § I 589a, as Customs Officers, Title 19 Cross-Designated TFOs are federal LEOs and are authorized to enforce the full range of federal law, including
*(footnote cont'd on next page)*

Department of Homeland Security, United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), in Los Angeles County, California. I am currently assigned to the HSI Ventura-Northridge, which is tasked with investigating federal crimes with nexus to the border, to include drug trafficking, and firearms trafficking.

5.   I am a Detective with the Los Angeles Police Department and have been so employed since 2000. I am assigned to Major Crimes Division, Transnational Organized Crime Section where I investigate Organized Crime Groups, Criminal Enterprises and Drug Trafficking Organizations. I have successfully completed over 1000 hours of law enforcement training in my approximately 22 years as a peace officer.

6.   Prior to my assignment as a detective with Major Crimes Division, I worked various assignments, which included patrol, Violent Crimes Task Force and Detective Support. While in the Los Angeles Police Academy, I received extensive training in the investigation of crimes, identification and collection of evidence and search warrant preparation and service. In addition, while at the Los Angeles Police Academy, I received 80 hours of narcotics related training. This includes identification of narcotics, the methods of packaging, methods of shipping, methods of consumption and the effects of various

violations of other titles of the U.S. Code, including, but not limited to, Title 18 and Title 31.

drugs.  I was also involved in the seizure of a large quantity of firearms and narcotics.

7.    I have been a member of several federal task forces labeled as "Organized Crime Drug Enforcement Task Force," responsible for the investigation and prosecution of a Consolidated Priority Organizational Target ("CPOT"), drug traffickers and organized crime syndicates.  In addition, I have been a part of several transcontinental criminal investigations conducted with various national and international police agencies into Israeli Organized Crime activities, to include narcotics trafficking, money laundering and conspiracy to commit murder.

8.    I have also received specific narcotics training from the Los Angeles County Police Academy on such topics as evidence of use, possession, influence, packaging, transportation, and sales of controlled substances.

9.    In October 2021, I received training on customs law, including violations of Title 19 of the United States Code, from DHS and ICE, as it pertains to the duties of a cross-designated TFO.

10.  As part my daily duties, I prepare various police reports, conducted follow up investigations, and documented reports of investigations and author search warrants. As part of this and past investigations, I have obtained numerous search warrants for digital device data.  As part of my experience, I have been a part of several investigations involving firearms

violations and have made a number of arrests related to firearms violations.

### III. <u>PRIOR APPLICATIONS</u>

11.  On August 23, 2022, a search warrant was granted by the Honorable Rozella A. Oliver, U.S. Magistrate Judge in the Central District of California, for the search of one digital device that was seized on July 19, 2022, from the possession of AASA, a security guard at an illegal gambling location, the Gable House.  A copy of the search warrant attached hereto as "Attachment C" and incorporated herein by reference.

### IV. <u>SUMMARY OF PROBABLE CAUSE</u>

12.  The LAPD, HSI, Drug Enforcement Agency ("DEA"), and Internal Revenue Services ("IRS") served a search warrant on July 19, 2022, at 4550 Gable Dr. Encino, CA ("Gable House") for an illegal gambling investigation.  During the service of the search warrant, AASA was detained and interviewed, and his cellphone[3] was seized as evidence.  While being interviewed by investigators, AASA provided the SUBJECT PREMISES as his home address.  AASA was also observed by investigators driving SUBJECT VEHICLE 1 on July 19, 2022 and had been seen on prior surveillance operations at the Gable House driving both SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2.

13.  Following the search warrant at the Gable House, a federal search warrant was approved by the Honorable Judge Rozella A. Oliver for the search of AASA's phone.  During the review of the AASA's phone, investigators discovered numerous

---

[3] SUBJECT DEVICE listed in Attachment C.

conversations, as recent as July 19, 2022 (the day the phone was recovered), facilitating firearm purchases and sales by AASA. These included firearms illegally equipped with suppressors, reported stolen firearms, submachine guns or other apparent automatic firearms, and "ghost guns."[4]  Some of the individuals AASA was engaging with regarding trafficking in firearms were identified as prohibited possessors (convicted felons, gang members).

14.  During separate surveillance operations on September 6 and September 12, 2022, conducted by the LAPD-MCD surveillance squad, AASA was seen coming and going from the SUBJECT PREMISES on multiple occasions driving SUBJECT VEHICLE 1 and, on one occasion in July 2022, AASA was driving SUBJECT VEHICLE 2.

15.  AASA does not possess a federal firearms license and is therefore not authorized to sell firearms.

16.  Based on my training and experience, including conversations with other law enforcement officers, a review of AASA's phone, and the evidence of illegal firearm transactions AASA is believed to be involved in, there is probable cause to believe AASA will have fruits of instrumentalities of the SUBJECT OFFENSES at the SUBJECT PREMISES, and/or on his person, and/or in the SUBJECT VEHICLES.

---

[4] A ghost gun is referred to as a Privately Made Firearm (PMF) which do not possess serial numbers, are sold without background checks, and are untraceable.  Ghost guns can be bought online and assembled at home.

## V.  <u>STATEMENT OF PROBABLE CAUSE</u>

17.  Based on my review of law enforcement reports, conversations with other law enforcement officers, and my own knowledge of the investigation, I am aware of the following:

**A.  Background – Search warrant at Gable House, Seizure of AASA Cell, AASA in Possession of Firearms and Ammunition, and Warrant for AASA's Phone**

1.  <u>Gable House Surveillance</u>

18.  On May 17, 2022, members of LAPD-MCD, Transnational Organized Crime Section ("TOCS") and HSI conducted surveillance at the Gable House for the purpose of investigating an illegal gambling location.  At approximately 8:53 p.m., LAPD Detective Stupar and LAPD Officer Kanzoghian observed SUBJECT VEHICLE 1 parked on the street close to the Gable House and a stocky Male, possibly Hispanic descent, with a ponytail dressed in all black retrieve a backpack from the trunk of the vehicle and subsequently walk up the driveway towards the Gable House.[5]

19.  On June 14, 2022, at approximately 1800 hours, members of LAPD-MCD, TOCS and HSI conducted surveillance of the Gable House.  During the surveillance, Detective Stupar again saw the same security guard as the May 17, 2022, surveillance, which he described as a stocky Male/Hispanic wearing all black clothing with a firearm holstered on his right hip.

20.  On July 12, 2022, at approximately 8:13 p.m., LAPD-MCD, TOCS and HSI were again conducting surveillance at the

_____

[5] Officer Kanzoghian and Detective Stupar later reviewed a photograph of AASA and identified him as person with the ponytail and as the Security Guard they observed on multiple occasions at the Gable House.

Gable House.  Officer Kanzoghian observed SUBJECT VEHICLE 2 enter the Gable House driveway, then relocate and park on the street.  Officer Kanzoghian described the driver as a Male/Hispanic with a ponytail who was previously identified as the same security guard at the Gable House.

2.   The Gable House Search Warrant

21.  On July 19, 2022, the LAPD, HSI, DEA, and IRS served a search warrant at the Gable House.  The circumstances of that search and the interview and encounter with AASA are set forth in Attachment C, paragraphs 36-42, which is incorporated fully herein.[6]  (Attachment C is the warrant for the phone seized from AASA's person, seized during the search of Gable House.)

22.   While at the scene of the Gable House, a search was then conducted of AASA's personal belongings and SUBJECT VEHICLE 1.  During the search of the Gable House, HSI TFO Mkrtchyan located a backpack, which contained a Glock 17 pistol, several fully loaded magazines for the Glock 17 pistol, a digital scale with what appeared to be narcotics residue, and .410 shotgun shell ammunition[7] which are not compatible with a Glock 17 pistol.  During AASA's detention at the Gable House, AASA

_____

[6] AASA provided investigators with a valid Bureau of Security and Investigative Services guard registration and a Bureau of Security and Investigative Services permit for exposed firearm.  On AASA's guard registration there was a listed PO Box address and on his exposed firearm permit was the SUBJECT PREMISES address.

[7] A .410 shotgun shell can be shot from a Taurus Judge revolver which has an elongated cylinder that allows it to chamber the .410 shotgun shells. In reviewing AASA's cell phone, on July 3rd, 2021, he sent a photograph of a Taurus Judge 4510 snub nose revolver to contact "Boi." "Boi" responded that he needed a price on them, and AASA replied 1300.

claimed dominion and control over the bag and its content. AASA provided investigators with proof of California Dealers Record of Sales ("DROS") for the Glock 17 pistol, showing the firearm was purchased by AASA.

23. Detective Kaminski conducted a search of SUBJECT VEHICLE 1. Inside the trunk of the vehicle was a Smith and Wesson .40 caliber semi-automatic firearm. AASA provided proof of DROS showing he had recently purchased the firearm. Also, inside the trunk of SUBJECT VEHICLE 1 was a plastic sandwich bag containing rifle rounds.[8]

24. On August 8, 2022, AASA's cell phone was transported to LAPD Robbery-Homicide Division for forensic download. Subsequently, the data from the cell phone was successfully downloaded but not examined or reviewed by law enforcement.

**B.    Federal Search Warrant and Firearms Trafficking on AASA's Cell Phone**

25. On August 23, 2022, the Honorable Rozella A. Oliver, United States Magistrate Judge for the Central District of California, signed a search warrant authorizing the search of AASA's cell phone (Attachment C (search warrant for AASA's phone)).

26. Detective Kaminski began reviewing the contents of the cell phone and discovered a number of messages involving the apparent illegal trafficking of firearms. Throughout the analysis of the phone, investigators determined AASA is acting as a firearms broker. AASA has firearms at his disposal, which

---

[8] AASA does not have a firearm registered in his name capable of firing rifle rounds.

he reaches out to contacts to sell by providing photographs and a price.  At the same time, contacts are reaching out to AASA trying to sell him firearms by providing photographs and a price.  At times, AASA appears to be acting  as a middleman/broker, specifically, AASA takes the photographs provided to him by contacts attempting to sell firearms and sends them to prospective buyers.

   a.   Upon further reviewing the cell phone, Detective Kaminski reviewed the full conversation with contact "Mike Mike Toys." A portion of the conversation from July 19, 2022, between 4:17:59 AM (UTC-7) and 3:57:01 PM (UTC-7) is as follows:

> Mike: "What's good my brother"
>
> AASA: "Hey bro u still got the MAC??"[9]
>
> Mike: "Yup"
>
> AASA: "What's the ticket??"
>
> Mike: "Shit im looking for around 2 what you
>     trying to pay I'll work with you"
>
> AASA: "Is it automatic or semi??"
>
> Mike: "I think it's automatic to be honest
>     not sure give"
>
> AASA: "Ok dam can u check plz".
>
> AASA: "What does it come with??"
>
> AASA: "Hey bro sorry busy"
>
> AASA: "I have on me right now $1100"

---

[9] Investigators training and experience leads them to believe a reference to the "MAC" is a reference to a MAC-11 style firearm.  Several photographs depicting a MAC-11 style machine pistol was sent from Mike to AASA.

> AASA: "But can u send me pic of what u have
>
> exact plz"
>
> Mike: Replies with 7 photographs of
>
> firearms.
>
> AASA: "Can u do the mac for 1100"[10]

b.   In reviewing this exchange of messages, as well the accompanied photographs, it is my opinion, based on my training and experience and speaking to other law enforcement officers involved in this investigation, this conversation is an attempt at an illegal firearm transaction involving an illegal assault weapons designed as a machinegun and based on the photographs, possible ghost guns.

c.   Detective Kaminski also reviewed a conversation with contact "USO Nick 2nd."  Utilizing the phone number associated with the contact, photographs exchanged in the thread, and department resources, this contact was identified as Nicholas Tasi Sumeo ("SUMEO").

i.   SUMEO works as a security guard and was arrested by LAPD – Hollywood Division on January 14, 2022. During the arrest, SUMEO was working as security at "Mr. Tempo Cantina."  Officers were conducting a guard card verification

---

[10] In reviewing the photograph, Investigators could decipher that the firearm was manufactured by MasterPiece Arms MPA Defender and equipped with serial number "FX17418". A DROS check on that serial number returned no record of registration, meaning the firearm was not registered in California.

check when they discovered a loaded P80 ghost gun in SUMEO's possession.  SUMEO was placed under arrest.[11]

       ii.   On April 19, 2022, at time stamp 8:57:28 PM (UTC-7), AASA sends "USO Nick 2nd" a photograph of a P80 ghost gun in a gun case.[12]  The photograph appears to be taken with the firearm in the trunk of a vehicle.  The photograph is followed with AASA stating "Glock 43 ghost clean $1100 In the box." "USO Nick 2nd" responds "Yeah I'm good uce.  Good looking though bro.  Got some big things for a lil cheaper."  AASA then states "I agree lol There AR n 300 blackout for $1500 clean."[13]

      d.   On March 7, 2022, at 8:33:49 PM (UTC-8) AASA was engaged in a conversation with contact "Rocco" in a "WhatsApp" messaging service chat.  Based on photographs/videos within the chat depicting "Rocco's" face and tattoos, and checks of law enforcement databases, investigators identified "Rocco" as Victor Anthony Balderas ("BALDERAS").

---

[11] The case against SUMEO for this arrest is still pending in the court system.  According to LAPD records, on May 12, 2022, the Los Angeles City Attorney's Office filed (1) count of 25400(a)(2) PC (Carrying a concealed firearm on person) and (1) count of 25850(a) PC (Carrying a loaded firearm on person in a public place) against SUMEO.

[12] The photograph of the firearm is equipped with GPS longitude and latitude coordinates 34°05'50.67" 118°20'37.69. Upon entering these coordinates into opensource maps.google.com, it returns to the parking lot of a Dunn-Edwards Paint located at 7064 N La Brea Avenue Los Angeles, CA 90028.

[13] 300 blackout refers to a type of ammunition. Some Assault Rifles are manufactured to be compatible with 300 blackout ammunition.

i.    BALDERAS is a convicted felon and documented gang member.[14] In the conversation, AASA sends "Rocco" a photograph of blue steel P80 handgun with the caption "P80 glock 19 compact 9mm $800." "Rocco" replies "That's not compact. I need something like urs." AASA replies "Lol a small one" and proceeds to send three separate photographs of P80 ghost handguns and one photograph of an apparent ghost gun rifle. "Rocco" replies, "How much the small ones" and AASA replies "Sup compact $900."

(I)   This conversation is again very clearly the negotiation of the illegal trafficking of firearms to a convicted felon and documented gang member.

ii.   Additionally, in the conversation, "Rocco" requests a compact firearm, typically utilized for easy concealment, that is "something like urs" in reference to AASA. A search and review of firearms registered to AASA, conducted by LAPD Detective Kaminski, revealed he does not have a compact firearm registered in his name. Additionally, there are no prior DROS sales indicating AASA had previously owned a compact firearm and sold it.

e.    AASA is engaged in conversation via text message and the messaging service, "WhatsApp," with a contact named "Chino Game." A search of law enforcement databases and resources, investigators identified Thuan Khanh Do ("DO") as "Chino Game". Through May 26, 2021 to October 12, 2021, AASA

---

[14] BALDERAS has a conviction on 1/29/2004 for 12020(a) PC (Unlawfully Carrying and Possession of Weapons).

shares numerous photographs of ghost guns, firearms equipped with suppressors, and assault weapons with associated prices via "WhatsApp." Via text message on June 9th, 2022, at 8:09:21 PM (UTC-7), AASA shares a photograph of an AR-15 with multiple magazines and a plastic grocery bag of ammunition followed by "All that for 2500." On June 20, 2022, at 2:01:53 PM (UTC-7) AASA shares a photograph of a Taurus Judge revolver.[15] The background of the photograph is similar to the background of the photographs "Mike Mike Toys" had in the photographs he sent to AASA.

      i.  Based on the photographs and conversation, it is my opinion AASA is attempting to sell firearms to DO.

    f.  AASA is also engaged in conversation with contact "Toko Ben Work".

      i.  On February 14th, 2022 at 7:44:55 PM (UTC-8) "Toko Ben Work" messages AASA stating "Wussup uce, u interested in coppin some thangs? Mainly big ones bro lmk."[16] AASA replies, "Pic uce?? N Ticket."[17] "Toko Ben Work" replies with photographs of multiple P80 ghost guns, ghost gun Assault Rifles, and weapons equipped with suppressors. "Toko Ben Work" then

---

[15] On July 20th, 2022, while searching AASA's bag at the Gable House, Detective Mkrtchyan discovered .410 rounds which are compatible with a Taurus Judge revolver.

[16] Based on my training and experience, the reference to "thangs" is a reference to firearms. "Mainly big ones" is a reference to firearms bigger than handguns, such as rifles. "lmk" is an abbreviation commonly used in texting for "let me know".

[17] Based on my training and experience, a request for a "ticket" is a request for the price of the firearms.

messages AASA "Ar's m16's r 1300 Ar50 2800."  AASA then replies, "I'll let my ppl know Toko be ready."

   ii.  On February 15th, 2022 at 11:38:33 AM (UTC-8) AASA messages "Toko Ben Work" "Toko we take the two black one" and sends back a photograph of two apparent ghost gun Assault Rifles equipped with suppressors that "Toko Ben Work" had previously sent him on February 14, 2022. AASA then says, "Save it plz." After some conversation about the suppressor no longer being included in the sale, AASA states on February 18, 2022 at 5:48:40 PM (UTC-8) "Ok Toko sound good heading to get the money now."

   (I)  On a separate message with "USO Nick 2nd" on February 15, 2022 at 11:34:00 AM (UTC-8), AASA provides the photographs provided by "Toko Ben Work."  "USO Nick 2nd" and AASA then engage in a conversation with  "USO Nick 2nd" stating, "Fasho uce lmk sole." AASA says "Uce waiting on the Tex back still."  "USO Nick 2nd"  states "Fasho uce sounds good sole hope he still got em." AASA states "I hope so to. It might be tonight or tmw morning for sure to pick up but we have it lock for us. Both of them."  "USO Nick 2nd"  states "Fasho uce sounds good sole, yeah ima need those lol."

   (II) On February 16, 2022, at 3:24:27 PM (UTC-8) AASA provides "USO Nick 2nd" with "Toko Ben Work" contact information in the form of a screenshot.  AASA then states "Uce hit ben up his be the guy u will contact ok. Uce he might not sell it but if he do his going to take off the silencer n if so I'm drop the price to 1300."  "USO Nick 2nd"

responds "That cool uce, can he leave the screw on compartment for it?"

(III)    On February 18, 2022, at 1:48:42 AM (UTC-8), AASA inquires "How did it go uce??"  "USO Nick 2nd" responds "It was smooth uce, nothing to serious."

(IV) Based on the combination of these two conversations, it is my opinion AASA brokered an illegal firearm deal between "Toko Ben Work" and "USO Nick 2nd" for two ghost gun rifles priced at $1,300 each.  The deal was completed on February 18th, 2022 when  "USO Nick 2nd" picked up the firearms.

iii. On March 7, 2022, at 6:05:30 PM (UTC-8) "Toko Ben Work" messages AASA "Any word on them k's uce."  AASA replies "Wassup Toko not yet."

iv.  On April 11, 2022, at 1:19:59 PM (UTC-7) AASA messages "Toko Ben Work" "Hey your boys still looking for AK??" "Toko Ben Work" replies "10 of them" and AASA states "Ok for sure Toko??" "Toko Ben Work" replies "Yea 10 What's the ticket on it."

v.   On April 30, 2022, at 1:49:47 PM (UTC-7) AASA messages "Toko Ben Work" and advises "I got the tex bout the ticket." "Toko Ben Work" replies "On the k's?" AASA confirms and states "1500 each". "Toko Ben Work" confirms "They got 10 right?"

vi.  On May 7, 2022, "Toko Ben Work" messages AASA and asks, "Them k's r clean/new right?" AASA confirms "Yes they are Toko" and then he advises "If u guys want it need to

16

pay half up front to get it started." "Toko Ben Work" then asks, "Can I get a pic of one faamolemole."

   vii. On May 19, 2022, at 5:36:55 PM (UTC-7) "Toko Ben Work" advised "uce it's a thumbs down on the thangs."

   viii. Based on my training and experience, it is my opinion that AASA and "Toko Ben Work" are engaged in the selling and buying of illegal firearms. This is consistent with AASA acting as a gun broker by buying guns from one person in order to sell them to another (his "people"). When "Toko Ben Work" inquired about the "k's" it is my opinion he is expressing interest in purchasing 10 AK-47 assault rifles.

27. The above conversations are a sample of conversations taken from the analysis of AASA's phone. There are several conversations, not included in this warrant, which based on my training and experience show AASA involved in illegal trafficking of firearms.

**C. Investigation of the SUBJECT PREMISES**

28. Based on a search of records from the California Department of Motor Vehicles, I learned AASA has SUBJECT VEHICLE 2 registered under his name with the SUBJECT PREMISES as his residence.[18]

29. During an interview of AASA in July 2022, AASA provided an exposed firearm permit which included his name and the SUBJECT PREMISES residence. He also provided his home address as the SUBJECT PREMISES.

---

[18] The vehicle is also registered under PETERSEN's name.

30.  Also, in July 2022, AASA also provided Officers and Investigators the SUBJECT PREMISES as his home address and was issued a release from custody citation (M03744) with the SUBJECT PREMISES listed as his home address.

31.  On September 6, 2022, members of the LAPD – MCD surveillance squad conducted surveillance at the SUBJECT PREMISES.  LAPD – MCD surveillance squad investigators observed SUBJECT VEHICLE 1 parked in the vicinity of the SUBJECT PREMISES.  LAPD – MCD surveillance squad investigators also observed a female matching the description of AASA's spouse, PETERSON, utilizing SUBJECT VEHICLE 2.  LAPD – MCD surveillance squad investigators observed AASA leaving the residence in SUBJECT VEHICLE 1.  LAPD – MCD surveillance squad followed AASA to a Western Dental in the city of Pasadena, and to the Santa Anita Mall, in the city of Arcadia, CA.  LAPD-MCD Surveillance squad watched AASA return to his residence.  Soon after, a female believed to be AASA's spouse, PETERSEN, was observed driving SUBJECT VEHICLE 2.

32.  On September 12, 2022, members of the LAPD – MCD surveillance squad were again conducting surveillance at the SUBJECT PREMISES.  AASA was observed leaving the SUBJECT PREMISES with a minor child taking SUBJECT VEHICLE 1 and he drove to Ethel Valley Preschool in Alhambra, where he dropped off the child.  Once AASA departed, AASA drove to United States Post Office in Alhambra where he was seen exiting with a package.  AASA then proceeded to the Gold's gym located in a shopping mall in Arcadia.  Once AASA left the gym, AASA drove to

the area of downtown Los Angeles, where LAPD – MCD surveillance
squad investigators observed SUBJECT VEHICLE 2 parked at the
curb with a California Highway Patrol ("CHP") unit was stopped
behind the vehicle.  LAPD – MCD surveillance squad investigators
observed a CHP Officer inspecting what appeared to be traffic
collision damage on SUBJECT VEHICLE 2.  A few moments later, the
CHP officer entered his vehicle and proceeded out of the
area.  AASA was observed speaking to the female driver of
SUBJECT VEHICLE 2.  A short time later, both SUBJECT VEHICLE 1
and SUBJECT VEHICLE 2 left the area and drove to area of the
SUBEJCT PREMISES.

### VI. TRAINING AND EXPERIENCE ON ITEMS TO BE SEIZED FROM A CRIMINAL'S RESIDENCE, VEHICLES, STORAGE LOCATIONS, AND PERSON

33.  Based on my training and experience, I know that
people involved in criminal activities store evidence of their
criminal activities, and the proceeds from their criminal
activities, at various locations over which they exercise
dominion and control.

34.  A criminal's residence, business, storage, garage,
vehicle and on their person are some of the primary locations I
have found evidence of criminal activity.  In this regard, I
know that:

a.   People involved in criminal activities often
maintain evidence, including those items I have listed in
Attachment B (incorporated by reference), at their residences so
that they have fast and convenient access to items.  Further,
because people involved in criminal activities are unlikely to

store the bulk of their assets (proceeds from criminal activities and valuable stolen property, such as firearms) in safe locations like banks, they are able to protect their assets by keeping them close at hand in places like their residences, garage, vehicles, and/or person.

b.   People involved in criminal activities maintain books, records, customer's lists, receipts, notes, ledgers (often referred to as "pay/owe" sheets) and other papers, for extended periods of time, relating to acquisition and distribution of assets from their illegal activities, to include firearms.  People involved in criminal activities also maintain addresses, telephone numbers, and contact information for co-conspirators, particularly in cases  involving the illegal sales of firearms.

c.   People involved in criminal activities often must maintain, on hand, large amounts of money in order to maintain and finance their ongoing criminal activity, and as a result of their ongoing criminal activity, to include drug trafficking, debt collection, extortion and firearms sales, and firearms trafficking.

d.   People who are involved in criminal activities often securely store their illegal proceeds, (cash, currency and financial instruments or documents of monetary value) as well as firearms, inside a 'safe' which can be location inside of a person's residence or other area on the premises.

    e.    People who are involved in criminal activities often have P.O. boxes where they receive information that is evidence of their criminal activities.

    f.    People involved in criminal activities often use vehicle to transport contraband, ill-gotten gains, fruit of the crime and evidence, including the items listed in Attachment B.

    g.    People involved in criminal activities often maintain evidence of their criminal activities on their computers, cellular telephones, and other digital devices.  They do this because these devices can hold substantial amounts of information in very compact locations.  Further, storing evidence of criminal activities on digital devices such as cellular telephones, computers, iPads etc. provides an advantage to the criminals as they are often able to lock the devices and protect the evidence of criminal activity from being observed by law enforcement officer.

## VII.  TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES

    35.    From my training, personal experience, and the collective experiences related to me by other law enforcement officers, I am aware of the following:

    a.    Persons who possess, purchase, or sell firearms often maintain records of their transactions and usually keep them in their residence, or in places that are readily accessible, and under their physical control, to include the SUBJECT VEHICLES, their person, and in locations such in their digital devices.  It has been my experience that prohibited individuals who own, and deal firearms illegally will keep the

contact information of the individual who is supplying firearms
to prohibited individuals or other individuals involved in
criminal activities for future purchases or referrals.
Similarly, criminal maintain the contact information of the
individual(s) who is supplying narcotics for future purchases or
referrals.

      b.   Those who illegally possess firearms often sell
their firearms and purchase firearms from those who know they
are prohibited persons.  Many people also keep mementos of their
firearms, including digital photographs or recordings of
themselves possessing or using firearms on their digital
devices, or of firearms that they wish to sell to others.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.  Evidence
of these transactions can be located at a person's home, vehicle
or their person.

      c.   Correspondence between persons buying and selling
firearms, including correspondence between co-conspirators in
the dealing of firearms without a license, often occurs over
phone calls, e-mail, text message, and social media message to
and from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms, frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the

unlawful sale of firearms to have photographs of firearms, they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms often use multiple digital devices.

### VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[19]

36.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[19] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

37.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

38.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress [TARGET]'s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of [TARGET]'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

26

2.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. <u>CONCLUSION</u>

39.   For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES, on the SUBJECT's PERSON, and/or in the SUBJECT VEHICLES described in Attachment A.

_____
Albert Shinfeld, Task Force
Officer
Homeland Security
Investigations

Subscribed to and sworn before me
this _____ day of October, 2022.


_____
UNITED STATES MAGISTRATE JUDGE

# Attachment C

AO 93C  (Rev. 8/18) Warrant by Telephone or Other Reliable Electronic Means (USAO rev. 12/20)　　☐ Original　　☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>Apple iPhone 12 Pro Max A2342, serial number HH5HC05T0D42, IMEI 355591193084000 seized on or about July 19, 2022, and which is currently in the custody of the Los Angeles Police Department in Los Angeles, California ("Subject Device"), as further described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  2:22-mj-03336 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:　　Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit or testimony are incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

XX in the daytime 6:00 a.m. to 10:00 p.m.　☐ at any time in the day or night because good cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

Date and time issued:　　8/23/2022 @ 4:47 p.m.

City and state:　　Los Angeles, CA

*Judge's signature*

The Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA:　　J. Mark Childs, x2433

AO 93C (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.: 2:22-mj-03336 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE"), seized on July 19, 2022, and currently maintained in the custody of the Los Angeles Police Department ("LAPD") in Los Angeles, California:

1.    One (1) Apple iPhone 12 Pro Max A2342, serial number HH5HC05T0D42, IMEI 355591193084000, LAPD evidence bar code P003487183.

**ATTACHMENT B**

**I.    ITEMS TO BE SEIZED FROM THE SUBJECT DEVICE**

1.    The items to be seized evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 846 (Attempt and conspiracy to distribute controlled substances), 18 U.S.C. §§ 922 (Illegal dealing of firearms), 18 U.S.C. §§ 924(c) (possession of a firearm in furtherance of a drug trafficking crime), Title 18 U.S.C. §§ 1956 and 1957 (Laundering of monetary instruments and Engaging in monetary transactions in property derived from specified unlawful activity) 18 U.S.C. §§ 1955 (Operating an illegal gambling business), 18 U.S.C. §§ 2421A (promotion or facilitation of prostitution and reckless disregard of sex trafficking), 18 U.S.C. 1343 (wire fraud) the "Subject Offenses")

    a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

    b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

i

      c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Instagram, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

      d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

      e.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

      f.    Contents of any calendar or date book;

      g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      h.    With respect to the SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

       ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

       v.  evidence of the times the device was used;

       vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

       vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

       viii.    records of or information about
Internet Protocol addresses used by the device;

       ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

   2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,

documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICE

3.  In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search the SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.  The search team will, in its discretion, either search the SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.  The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in the SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether

iv

the SUBJECT DEVICE and any data thereon falls within the scope
of the items to be seized.  The search team may also search for
and attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

e.  If the search team, while searching the SUBJECT
DEVICE, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that
SUBJECT DEVICE pending further order of the Court and shall make
and retain notes detailing how the contraband or other evidence
of a crime was encountered, including how it was immediately
apparent contraband or evidence of a crime.

f.  If the search determines that the SUBJECT DEVICE
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the SUBJECT DEVICE and delete or destroy all forensic copies
thereof.

g.  If the search determines that the SUBJECT DEVICE
does contain data falling within the list of items to be seized,

the government may make and retain copies of such data and may access such data at any time.

       h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

       i.   The government may also retain the SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

       j.   After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

      4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

vi

custody and control of attorneys for the government and their support staff for their independent review.

5.    The special procedures relating to digital device found in this warrant govern only the search of digital device pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/16)

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Apple iPhone 12 Pro Max A2342, serial number HH5HC05T0D42, IMEI 355591193084000 seized on or about July 19, 2022, and which is currently in the custody of the Los Angeles Police Department in Los Angeles, California ("Subject Device"), as further described in Attachment A

)
)
)
)
)
)
)
)
)

Case No. 2:22-mj-03336

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment B, paragraph 1. | |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

/S/
_____
Applicant's signature

Blake Ouzounian, Special Agent of DHS, HSI
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 8/23/2022

City and state: Los Angeles, CA

Rozella a. Oli
_____
Judge's signature

The Hon. Rozella A. Oliver, U.S. Magistrate Judge
_____
Printed name and title

AUSA: J. Mark Childs, x2433

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE"), seized on July 19, 2022, and currently maintained in the custody of the Los Angeles Police Department ("LAPD") in Los Angeles, California:

1. One (1) Apple iPhone 12 Pro Max A2342, serial number HH5HC05T0D42, IMEI 355591193084000, LAPD evidence bar code P003487183.

## ATTACHMENT B

I.  **ITEMS TO BE SEIZED FROM THE SUBJECT DEVICE**

1.   The items to be seized evidence, fruits, or
instrumentalities of violations of 21 U.S.C. §§ 841(a)(1)
(distribution and possession with intent to distribute
controlled substances) and 846 (Attempt and conspiracy to
distribute controlled substances), 18 U.S.C. §§ 922 (Illegal
dealing of firearms), 18 U.S.C. §§ 924(c) (possession of a
firearm in furtherance of a drug trafficking crime), Title 18
U.S.C. §§ 1956 and 1957 (Laundering of monetary instruments and
Engaging in monetary transactions in property derived from
specified unlawful activity) 18 U.S.C. §§ 1955 (Operating an
illegal gambling business), 18 U.S.C. §§ 2421A (promotion or
facilitation of prostitution and reckless disregard of sex
trafficking), 18 U.S.C. 1343 (wire fraud) the "Subject
Offenses")

a.   Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

b.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

i

   c. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Instagram, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

   d. Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

   e. Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

   f. Contents of any calendar or date book;

   g. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

   h. With respect to the SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

v.  evidence of the times the device was used;

vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

viii.    records of or information about
Internet Protocol addresses used by the device;

ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,

documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICE

3.  In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search the SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.  The search team will, in its discretion, either search the SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.  The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in the SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether

the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

     ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

     iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

     e. If the search team, while searching the SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

     f. If the search determines that the SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

     g. If the search determines that the SUBJECT DEVICE does contain data falling within the list of items to be seized,

the government may make and retain copies of such data and may access such data at any time.

  h. If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

  i. The government may also retain the SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

  j. After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

  4. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their
support staff for their independent review.

     5.    The special procedures relating to digital device
found in this warrant govern only the search of digital device
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

**AFFIDAVIT**

I, Blake Ouzounian, being duly sworn, declare and state as follows:

**I.  PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of an application for a warrant to search one (1) digital device (the "SUBJECT DEVICE"), in the custody of the Los Angeles Police Department ("LAPD") in the city of Los Angeles, California, as described more fully in Attachment A.

a.    One (1) Apple iPhone 12 Pro Max A2342, serial number HH5HC05T0D42, IMEI 355591193084000, LAPD evidence bar code P003487183 ("**SUBJECT DEVICE**").

2.    The **SUBJECT DEVICE** was recovered from Chuck Leroy AASA ("AASA"), date of birth 08/23/1988, California driver's license F5744382 on July 19, 2022, at 4550 Gable Drive, Encino, California ("Gable Location").  The SUBJECT DEVICE is, currently, in the custody of the Los Angeles Police Department.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 846 (Attempt and conspiracy to distribute controlled substances), 18 U.S.C. §§ 922 (Illegal dealing of firearms), 18 U.S.C. §§ 924(c) (possession of a firearm in furtherance of a drug trafficking crime), Title 18 U.S.C. §§ 1956 and 1957 (Laundering of monetary instruments and Engaging in monetary transactions in property derived from specified unlawful activity) 18 U.S.C. §§ 1955

(Operating an illegal gambling business), <u>18 U.S.C. §§ 2421A</u>
<u>(promotion or facilitation of prostitution and reckless</u>
disregard of sex trafficking), 18 U.S.C. 1343 (wire fraud) the
"Subject Offenses"), as described more fully in Attachment B.
Attachments A and B are incorporated herein by reference.

    4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant
and does not purport to set forth all my knowledge of, or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

    5.    I am a Special Agent ("SA") with the Department of
Homeland Security, United States Immigration and Customs
Enforcement ("ICE"), Homeland Security Investigations ("HSI"),
in Los Angeles County, California, and I have been so employed
since November 2019.  I am currently assigned to the HSI
Ventura-Northridge, which is tasked with investigating federal
crimes involving fraud schemes to include marriage fraud and
document benefit fraud, smuggling of narcotics, money
laundering, illegal gambling, firearms violations, immigration
crimes, child exploitation, human trafficking, and various other
violations of immigration and customs law.  I have been employed
as a federal law enforcement officer since April 2007. Prior to

my employment with HSI, I was a Border Patrol Agent and Customs
and Border Protection Officer.

6. I am a graduate of the Criminal Investigator Training
Program and ICE Special Agent Training Program at the Federal
Law Enforcement Training Center located in Brunswick, Georgia.
These courses provided me with training in various aspects of
organized crime, drug investigations, money laundering,
financial crimes, firearms violations, human trafficking, and
immigration crimes relating to document benefit fraud and
marriage fraud.

7. Through my training, experience, and consultation with
other, more experienced agents and law enforcement officers, I
have become familiar with the methods of operation used by
people who are involved in narcotics smuggling, firearms
violations, marriage fraud schemes, human trafficking, and
financial crimes, specifically, illegal gambling, and money
laundering. I am familiar with how criminal organizations use
digital devices and financial institutions to facilitate and
conceal their crimes.

8. During my tenure with HSI, I have gained a working
knowledge on investigations involving narcotics smuggling,
firearms violations, illegal gambling, money laundering, and
marriage fraud. I have conducted surveillance and assisted with
the service of search warrants involving illegal gambling.  I
have seized large amounts of bulk U.S. currency derived from
proceeds of specified unlawful activity.

9.   Additionally, I have conducted and participated in
many aspects of criminal investigations, including reviewing
immigration documents, conducting physical surveillance, serving
subpoenas, debriefing sources, conducting interviews, executing
search warrants, seizing evidence, and making arrests.  I am
familiar with the facts and circumstances of this investigation
because of my participation and discussions with other law
enforcement officers involved with this investigation.

### III. SUMMARY OF PROBABLE CAUSE

10.  Since May 2022, HSI has been investigating Yevgeni
"GIORA" Gershman ("GERSHMAN"), Allan "ELIKA" Austria
("AUSTRIA"), Yarin "YC" Cohen ("COHEN"), Evgeni "EUGENE"
Tourevski ("TOUREVSKI"), Craig Franze ("FRANZE"), and others
("Target Subjects") for violations of federal law, and their
involvement in an illegal, high-stakes gambling operations,
promotion or facilitation of prostitution, firearms violation,
money laundering, wire fraud, marriage fraud, and attempted
extortion incidents.  I anticipate this to be a large-scale and
long-term investigation, which is, currently, being supported by
the U.S. Internal Revenue Service ("IRS"), the Los Angeles
Police Department ("LAPD"), and the U.S. Drug Enforcement
Administration ("DEA").

11.  The Target Subjects named above are operating their
criminal gambling-related activities in and around the Central
District of California ("CDCA").  As discussed further below,
GERSHAMN is high-ranking member of an Israeli transnational
organized crime group whose members are involved in violent

4

acts, sophisticated money laundering schemes, criminal threats, illegal gambling, and prostitution.

12. The investigation accelerated when in March 2002, law enforcement received a complaint from a would-be gambler who lost $1.2 million dollars in an illegal high-stakes poker game that operated in Los Angeles County ("G1"). G1 suspected that cheating was taking place at the illegal poker game and refused to pay. Soon after, G1 was contacted by subjects that G1 believed to be associated with organized crime, specifically GERSHAMN, and who were attempting to force G1 to pay, using threats to G1 and their family's safety.

13. On July 19, 2022, the LAPD, along with HSI SAs, the DEA, and the IRS, served a state search warrant, which is attached hereto as "Attachment C" and incorporated herein by reference, while an active, illegal high-stakes casino was being operated by GERSHAMN and others at a luxury residential house located at 4550 Gable Drive, Encino, California ("Gable Location") where the **SUBJECT DEVICE** was seized from an armed guard providing security at the Gable Location.

14. On July 19, 2022, the **SUBJECT DEVICE** was seized from Chuck Leroy AASA when he was detained at the Gable Location, while AASA was working as an armed security guard.

15. Based upon our investigation, there is probable cause to believe that a search of the **SUBJECT DEVICE** will uncover evidence related to TARGET SUBJECTS's organized criminal activities and the SUBJECT OFFENSES.

## IV. STATEMENT OF PROBABLE CAUSE

16. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of this investigation, I am aware of the following:

**A.  HSI Investigation Related to GERSHMAN and others**

17. LAPD Detective and HSI Task Force Officer ("TFO") Albert Shinfeld, who is working with me on this investigation, was informed by the Israeli National Police and others that GERSHMAN, an Israeli national who arrived in the United States on or about September 21, 2021, is a high-ranking member of the Michael TANSKI Israeli-Russian Organized Crime group.  Per TFO Shinfeld, GERSHMAN has criminal convictions in Israel, including conspiracy to commit murder, causing first degree death, as well as narcotics trafficking.  Per Israeli and other investigators, GERSHMAN is suspected of being skilled in money laundering and setting up shell companies to cover up illicit proceeds from drug sales, loan sharking and gambling operations.

18. Since around May of 2022, HSI and other law enforcement agencies have been jointly investigating GERSHMAN and his associates that are operating in the CDCA.  Based on physical surveillance, trash searches, database checks, pole camera[1] monitoring, a review of records conducted by HSI and other law enforcement agencies, and information provided by G1 and other witnesses, GERSHMAN, is heavily involved in illegal

_____

[1] On May 25, 2022, members of the LAPD-Major Crimes Division installed a Pole Camera on a public street with view of GERSHMAN's home, located at 24375 Hatteras Street, Woodland Hills, CA.

gambling, loan sharking and debt collection within the CDCA.
Based on surveillance, GERSHMAN lives at 24375 Hatteras Street,
Woodland Hills, California 91367 and does not appear to hold a
legitimate job or employment.

19.  As described in Attachment C (state search warrant),
based on surveillance by law enforcement, GERSHMAN and others,
including the Target Subjects named above, have operated an
illegal casino at the Gable Location on multiple occasions[2].
Based on an investigation by law enforcement, on July 19, 2022,
a state search warrant was served at the Gable Location.
Attached hereto as Attachment C is the state search warrant for
the Gable Location.  During the service of the search warrant at
the Gable Location, illegal gambling activities were in full
swing, and 48 individuals were detained, searched, interviewed,
and/or cited to state court for being present at an illegal
gambling location.

20.  On July 19, 2022, the Gable Location was set up to
primarily serve as an illegal gambling-poker house, with an on-
site valet, an armed security guard at the door (namely, AASA
from whom investigators seized the **SUBJECT DEVICE**), a cashier
(also known as a "chip runner"), a chef and card dealers.  The
home maintained three (3) poker tables, large amount of playing

---

[2] The Gable Location is a large, five (5) bedroom, 5800
square-foot luxury home situated in the Encino Hills and
overlooking the San Fernando Valley.

chips, chef prepared food, large quantity of alcoholic drinks, and other services for would-be players and visitors.[3]

21. Amongst those who were detained, there were thirty-six (36) men, and twelve (12) female attendees. The female attendees were provocatively dressed and based on interviews at the scene and other interviews conducted, they appeared to provide massage service, serve drinks, or provide sexual acts.

22. Several digital devices were seized from operators of the Gable Location and attendee players, including the **SUBJECT DEVICE** from the security guard, AASA. As discussed herein, the **SUBJECT DEVICE** from the security guard will provide evidence of person(s) who hired AASA for the event (evidence of the management of gambling operation), methods and weapon(s) used to protect the gambling operations, locations of other gambling operations, methods of hiring staff at the gambling operations, methods used to protect or transfer illegal proceeds, and transfer/purchase of firearms, among other criminal activity discussed below, including the sale of narcotics and firearms.

---

[3] At the time of search, the inside of the Gable Location did not have the indicia of a traditional personal residence. The Gable Location contained minimal personal belongings, lacked decorations seen with a typical personal residence, and contained open rooms that were sparsely filled with furniture or personal affects. The Gable Location was arranged to promote an atmosphere typically seen with a party location and illegal gambling.

**B.    January 26, 2022 Search of Illegal Casino at 13359 Chandler Boulevard, Sherman Oaks, CA**

23.    On January 20, 2022, the Honorable Maria A. Audero, U.S. Magistrate Judge, USDC-CDCA, issued a search warrant for an illegal gambling operation located at 13359 Chandler Boulevard, Sherman Oaks, CA 91401 ("Chandler Home").  On January 26, 2022, investigators from the DEA, LAPD, and the United States Postal Inspection Service ("USPIS"), executed the search warrant at the Chandler Home.  During the execution of the search warrant, at the Chandler Home, GERSHMAN and others were detained, and evidence of a gambling operation was seized.

24.    On January 26, 2022, during the execution of the search warrant at the Chandler Home, an Apple iPhone 12 Max with serial number F2LF56X00D56, was recovered and determined to belong to GERSHMAN.  At the Chandler Home, investigators also seized multiple loaded firearms, including a "ghost gun[4]".  Pursuant to the federal warrant, GERSHMAN's phone was searched.

25.    Investigators learned that GERSHMAN was working with or in partnership with TOUREVSKI, AUSTRIA, COHEN, KATS, FRANZE, and others.

---

[4] A ghost gun is referred to as a Privately Made Firearm (PMF) which do not possess serial numbers, are sold without background checks, and are untraceable.

## C. SEARCH OF GERSHMAN'S CELL PHONE

26. LAPD Detective Daniel Kamniski, a member of LAPD
conducted a search of GERSHMAN's phone.  Detective Kaminski
discovered several incriminating conversations indicating that
GERSHMAN was involved in the facilitation, and operation, of
illegal gambling locations.  Specifically, GERSHMAN was
communicating with several females in attempts to have them
"work" in his games.

27. One such conversation occurred on January 26, 2022,
GERSHMAN had a conversation with an individual saved under
contact name "Джорди La[5]" In the conversation, the party
identified themselves as "Jordi".  On January 26, 2022, at
4:35:38 PM (UTC) Jordi messaged GERSHMAN stating, "Hey love it's
Jordi I just wanted to get the info for tonight's game and
double check that Monika and I are both good to work?" GERSHMAN
responded, "Hi love what's up Yes we have a game in o'clock 930
come". Jordi replied, "Address?" to which GERSHMAN replied,
"13359 Chandler Blvd.".

28. That evening, federal agents with the DEA and USPIS,
along with LAPD, served a search warrant at the Chandler Home.
Along with GERSHMAN, Jordan Natalie RODGERS, with a date of

---

[5] GERSHMAN's native language is Russia.  Based on review of
his cellular phone and follow up interview with GERSHMAN it
appears that GERSHMAN also speaks other languages including
Hebrew.  GERSHMAN's phone contains a number of conversations
both in Russian and Hebrew.

birth of January 3rd, 1991, and a WA driver's license No. 1NZ63F958 was detained at the location.  Investigators believe ROGERS is "Jordi".

29.  In a separate conversation with contact "Вива 2", GERSHMAN sent a photograph depicting a clear plastic bag, the size of a sandwich bag, containing a white powdery substance resembling cocaine sitting on a wooden table.  In a conversation with contact "Элика", whose phone number is associated with Allan "ELIKA" Austria, there is conversation containing photographs and screenshots of pills identifying them as Xanax and Zolpidem.

30.  Also, on GERSHMAN's cell phone, Detective Kaminski discovered videos depicting card game-type gambling occurring at apparent residences.  In a WhatsApp conversation with contact "Пжел", GERSHMAN received a video depicting several males sitting around a poker table with casino chips in front of them. As the video scans the location, you see several females dressed provocatively walking through the location, in addition to more poker tables and apparent players.  After having viewed this video, investigators believe the location is 6447 Weidlake Drive Hollywood, CA [6].

---

[6] Investigators are aware that 6447 Weidlake Drive, Hollywood, CA is a multi-story, fourteen (14) bedroom, 14,000 square foot home located in the Lake Hollywood hills area of Los Angeles County.  According to internet search the home rents for $39,500 per month.  Furthermore, investigators were aware that a subject of this investigation named Craig Franze rented the home for an illegal gambling location.

31.   In GERSHMAN's phone, in addition to the evidence of hiring females to "work" potential "games" and videos of apparent illegal gambling locations, there is evidence of several marker sheets or pay sheets in a conversation between GERSHMAN and a contact listed as "Жэка La". These marker sheets show expenses, rake[7] amount, players wins and losses, and portions earned by games managers "YC", "ELICA", "GIORA", and "EUGEN".

32.   While analyzing the phones' content, Detective Kaminski discovered multiple possible addresses being utilized as illegal gambling locations.  One such address was 4550 Gable Drive, which is mentioned on multiple occasions between several different contacts and GERSHMAN.

**D.   July 19, 2022 Gable Location Warrant Service**

33.   On July 19th, 2022, at approximately 2330 hours, members of the DEA's Special Response Team ("SRT") served a search warrant at 4550 Gable Dr., Encino, CA 91316 ("Gable Location").  Prior to the service of the warrant, surveillance

---

[7] Per California gambling statues, California considers a "prohibited game" as any game that qualifies as either a banking or percentage game.  A banking game is when someone collects money from the losers that participate in the game and use that collected money to pay the winners of the game.

A "percentage game" is a game where the house collects money that is calculated as a portion of bets made.  This section criminalizes the game if you act as a "house" and collect fees based (rake) on the number of bets made into that poker game. Based on investigators finding the poker games being investigated collect fees based on the number of bets made into that poker game and act as a bank.

conducted by LAPD and HSI, coupled with information obtained through the cell phone of GERSHMAN, showed activity consistent with an illegal gambling location at the Gable Location on Tuesday evenings starting at approximately 2000 hours[8]. Once DEA-SRT had completed the initial entry and service, Investigators discovered 48 people detained who were present at the location. Inside the location were three professional style poker tables, poker chips, playing cards, food, alcohol, valet service, and security. After a walk-through of the residence, investigators began interviewing the individuals present.

**E.   DEA Airwing**

34.   Investigators reviewed footage from the DEA airwing which flew above the Gable Location during the execution of the search warrant. Shortly after the initiation of the search warrant, investigators observed an individual who witnessed law enforcement's approach to the Gable Location, running towards the backyard where within seconds various individuals began scampering in various directions.  Soon after, an unknown individual moving hastily by the pool was observed falling into the pool and another individual appear to place items into the brush next to the pool.  Investigators suspect the person who fell into the pool was Evgeni TOUREVSKI.

35.   Based on my training and experience individuals moving quickly to discard items is indicative of an attempt to conceal

---

[8] Investigators had conducted several separate surveillance operations of the Gable Location on 5/17/22, 6/14/22, and 7/12/22. All of these days were a Tuesday and activity at the location began around approximately 2000 hours each day.

contraband or evidence of criminal activity. Investigators did not learn about this information from DEA Airwing until after the location was vacated and had no opportunity to recover the items.

**F.    July 19, 2022 Interview of AASA and Seizure of SUBJECT DEVICE**

36.    On July 20, 2022, at approximately 5:05 a.m., at the Gable Location, LAPD Detective Kaminski and HSI SA Austin Koval, conducted an interview of AASA. Prior to the interview, Detective Kaminski admonished AASA of his Miranda rights and AASA acknowledged he understood his Miranda rights and agreed to waive them. During the interview, AASA admitted to being hired security for the Gable Location and only working there for the first time on July 19, 2022.[9] AASA stated that he was covering for a friend "Nick" and had never been to a poker house, such as the Gable Location, in the past. AASA was in possession of a firearm, namely, a Glock 17, which was kept inside the manufacturer gun box, which, in turn, was inside a bag. AASA presented investigators with a proof of California Dealers Record of Sales[10] ("DROS") for the Glock 17, showing the firearm was purchased by AASA. AASA presented a valid guard card.[11]

---

[9] AASA was seen working security at the Gable Location on three separate occasions during surveillance operations on 5/17/22, 6/14/22, and 7/12/22.

[10] DROS is California Department of Justice system which functions as a background check form, reporting system, and gun registration system.

[11] A guard card is a permit issued by the State of California that allows a person over the age of 18 to work as a security guard in the state of California. Security guards must
*(footnote cont'd on next page)*

14

37.     During the search of AASA's bag, TFO Asatur Mkrtchyan observed, in addition to the firearm, several fully loaded magazines, and a digital scale with what appeared to be narcotics residue.  Based on my training and experience, I suspect that AASA was in possession of the digital scale to weigh narcotics, and AASA was potentially involved in the sale of narcotics.

38.     During the interview, for his work at the Gable Location, AASA stated he would get paid a flat rate of $400 plus any additional tips.  AASA stated Nick would pay him, in person, when he would see him. During the interview, Detective Kaminski advised AASA he would be recovering his phone as evidence (pursuant to the search warrant, attached hereto as Attachment C).  AASA became upset because he did not know how he would be getting home without his phone and stated he was going through problems with his wife. Detective Kaminski offered to go through his phone at the Gable Location and AASA responded, "I don't mind, sir. It's just. I'm being honest with you. I just don't want my wife to fucking.  I'm already going through a whole process."

39.     Detective Kaminski then began going through AASA's phone in AASA's presence.  While reviewing the **SUBJECT DEVICE**, Detective Kaminski saw several text message conversations from different contacts requesting AASA to work security for different poker games.  There were messages on the **SUBJECT**

---

register via the Bureau of Security and Investigation Service and, if they qualify, they may apply for an exposed firearm permit.

15

**DEVICE** about negotiation on prices for different events.  While going through the **SUBJECT DEVICE** with Detective Kaminski, AASA would explain who the individuals were that AASA was messaging, and the prices were for a different private event.

40.  On the **SUBJECT DEVICE**, Detective Kaminski saw a conversation with contact "Mike Mike Toys".  This conversation appeared to be a negotiation of the illegal purchase of a firearm.  On the **SUBJECT DEVICE**, accompanied in the text thread, were several photographs of sub-machine and AR-15 style firearms.  Based on Detective Kaminski's training and experience, the depicted firearms appear to be unlawful assault rifles, possibly "ghost" rifles.  Per Det. Kaminski, the form by which AASA and the other person were conducting the transaction appeared to be illegal as they were trying to avoid using a Federal Firearms Licensed Dealer to transfer the weapons (as discussed in more detail below).

41.  After discovering this information, Det. Kaminski advised AASA there was not enough time to go through the whole phone and he would have to retain and book the **SUBJECT DEVICE** into evidence.  On August 8, 2022, AASA's **SUBJECT DEVICE** was transported to LAPD Robbery Homicide for forensic download. Subsequently, the data from the **SUBJECT DEVICE** was successfully downloaded but not examined or reviewed by law enforcement.

42.  Based on conversations with other law enforcement officers, records and from the Alcohol, Tobacco, Firearms, and Explosives ("ATF"), AASA does not possess a Federal Firearms License to ship, transport, or receive any firearm in interstate

or foreign commerce.  Therefore, the would-be transactions with "Mike Mike Toys" are suspected to be in violation of federal law, including, Title 18, United States Code, Section 922.

43.  Based on my training and experience, along with investigators prior surveillance of AASA working the Gable Location as security, and AASA's seemingly untruthful statements to investigators throughout his interview, investigators believe there will be incriminating evidence on the **SUBJECT DEVICE** to aid and assist in the identification of house managers and the operation of illegal poker games at the Gable Location. Furthermore, investigators also believe information concerning additional illegal gambling houses and the illicit sale of firearms and narcotics would additionally be recovered from the **SUBJECT DEVICE**.  Thus, I believe there is probable cause to believe the **SUBJECT DEVICE** contains evidence related to the Subject Offenses and additional crimes.

**G.  Interviews of Confidential Sources Regarding AASA**

44.  Investigators interviewed a confidential source ("CS1[12]") who was present at the Gable Location during the search

---

[12] CS1 is, currently, in good standing with the Los Angeles Police Department.  CS1 was present during the service of the search warrant at the Gable Location and was cited for being present at a gambling location.  CS1 has proven to be reliable to the extent CS1's information has been corroborated.  CS1 is not signed up by law enforcement and is an unpaid confidential source of information.  CS1 is facing a Los Angeles City Municipal Code violation for being present at a gambling location, section 43.13.2.  CS1 is not an official confidential source and his/her motivation, among others, is to seek revenge against illegal gambling establishments due to detrimental effects on his/her life, causing major financial and psychological harm to CS1.  CS1's criminal history includes, but
*(footnote cont'd on next page)*

17

warrant has been to the Gable location on several occasions in 2021 and 2022 and stated **AASA** has been seen working as a security guard not only at the Gable Location but also at other locations where similar illegal gambling activity was taking place.

45. Investigators interviewed a second confidential source ("CS2")[13] who was present at the Gable Location on multiple occasion between 2021 and 2022, who has identified AASA as a security guard who routinely worked at the Gable Location and carried firearms. CS2 was previously operating an illegal gambling location and was also employed as a "chip runner" by certain of the Target Subjects. CS2 has an insight into the ins/outs of the illegal gambling activity. CS2 explained the

---

not limited to, prior convictions for; disorderly conduct in 2012, for which he/she received 12 months of probation, imposed sentenced and restitution; criminal threats in 2013, no disposition was noted; and obstruct a public officer, driving under the influence, battery on a police officer, and hit and run property damage in 2016 for which he/she convicted for driving under the influence and obstruction and was fined and received 36 months probation and 48 hours jail, and/or work program - 13 days in jail or a fine.

[13] CS2 is, currently, in good standing with the Los Angeles Police Department and Homeland Security Investigations and has proven to be reliable to the extent CS2's information has been corroborated. CS2 is an unpaid confidential source information and is not facing any criminal charges. CS2 is not an official confidential source with law enforcement but has been providing information to law enforcement since July 2022. CS2 does not have a criminal history but has been involved in illegal gambling and money laundering. CS2 obtained a high interest loan from GERSHMAN to cover gambling loses. CS2 was not able to keep up with payments due to exuberant interest charged by GERSHMAN and defaulted on their loan. CS2's motivation, among others, is to seek revenge against illegal gambling establishments due to detrimental effects on his/her life, causing major financial and psychological harm as well as hopes to erase his/her debt. CS2 could possibly be seeking to shelter themselves from prosecution for his/her involvement in illegal gambling operations.

methods of operations to include the structuring of payments to/from players, the various fees charged by the house, the methods by which the house collects the illegal rake, and fees charged to employees of the house, including working girls and card dealers.  CS2 reviewed documents seized from the Gable Location related to accounting and marker sheets and explained the methodology of how financial data was documented, to include players receiving markers, dollar amounts, expenses, winnings and losses and the share of profits between Target Subjects.

46.  I suspect that **AASA** noticed or was notified of law enforcement's approach and placed the firearm he was suspected to be carrying on his person in his backpack.  I suspected that AASA did that to disguise his involvement at the Gable Location.

**H.  Narcotics Found at the Gable Location**

47.  I spoke with DEA Special Agent Vittoria Incandela who participated in the service of the warrant at the Gable location on July 19, 2022.  SA Incandela told me that she recovered two (2) clear plastic bags containing small amounts of an off-white substance resembling cocaine from a female attendee and an additional clear plastic Ziploc bag containing an off-white substance resembling cocaine on the ground under a vehicle close to the entrance to the home.

48.  Yaaqov Vaknin ("Vaknin") was encountered at the Gable location by investigators and photographed. Vaknin was seen by investigators with an off-white powdery substance on both of his nostrils.  Based on my training and experience, this is consistent with the use of narcotics (likely, cocaine), and I

suspect that Vaknin did not realize that his nose was covered with a white powder residue.

### V.  TRAINING AND EXPERIENCE ON THE OFFENSES

49.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale, and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In

20

addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

       d.   Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices.  Drug traffickers often keep records of
meetings with associates, customers, and suppliers on their
digital devices, including in the form of calendar entries and
location data.

       e.   Individuals engaged in the illegal purchase or
sale of drugs and other contraband often use multiple digital
devices.

       f.   I also know that individuals who are engaged in
sales, transfer or possession of illegal firearms would possess
evidence of these transactions on their digital devices.  I know
that because Detective Kaminski has seen evidence of this on the
**SUBJECT DEVICE**, which he reported to me.  Based on my training
and experience and per 18 U.S.C. § 922 it is unlawful for any
person, except for licensed dealers, to engage in the business
of dealing firearms.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

   50.  As used herein, the term "digital device" includes the
SUBJECT DEVICE.

   51.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

52.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data in a short period of time for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

       c.  The process for searching a phone can be lengthy,
and if a forensic exam cannot be conducted locally, the
telephones will need to be sent to an offsite forensic
laboratory for analysis.

    53.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

       a.  Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

       b.  In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an

24

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

        c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress AASA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of AASA's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VII. <u>CONCLUSION</u>

54.  For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the **SUBJECT DEVICE** described in Attachment A.

Attested to by the applicant in accordance with the requirements of <u>Fed. R. Crim. P. 4.1</u> by telephone on this <u>23rd</u> day of August, 2022.

THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT-C

DX (7/18/22)

SW No.

SW NO. _____

## STATE of CALIFORNIA, COUNTY of LOS ANGELES,
### SEARCH WARRANT and AFFIDAVIT

# (AFFIDAVIT)

**Peace Officer Daniel Kaminski, Serial No. 40821** swears under oath that the facts expressed by him in the attached and incorporated Affidavit are true and that based thereon he has probable cause to believe and does believe that the articles, property, and persons described below are lawfully seizable pursuant to Penal Code Section 1524 et seq., as indicated below, and are now located at the locations set forth below. Wherefore, Affiant requests that this Search Warrant be issued.

| | | | | |
|---|---|---|---|---|
| **NON-DISCLOSURE REQUESTED:** | ☐YES | ☒NO | **RETURN EXTENSION REQUESTED:** | ☐YES ☒NO |
| **Pc 1040-1042 SEALING REQUESTED:** | ☒YES | ☐NO | **HOBBS SEALING REQUESTED:** | ☒YES ☐NO |
| **PC 1546.2(a) DELAY OF NOTICE REQUESTED:** ☐YES | | ☒NO | **NIGHT SERVICE REQUESTED:** | ☒YES ☐NO |

*(Signature of Affiant)*

# (SEARCH WARRANT)

**THE PEOPLE OF THE STATE OF CALIFORNIA TO ANY PEACE OFFICER IN THE COUNTY OF LOS ANGELES:** proof by affidavit, having been this day made before me by **Detective Daniel Kaminski, Serial No. 40821** that there is probable cause to believe that the property or person described herein may be found at the location(s) set forth herein and that it is lawfully seizable pursuant to Penal Code Section 1524 et seq., as indicated below by "☒"(s), in that:

☐ property was stolen or embezzled;

☒ property or things were used as the means of committing a felony;

☒ property or things are in the possession of any person with the intent to use them as a means of committing a public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their being discovered;

☒ property or things to be seized consist of any item or constitute any evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony;

☐ property or things to be seized consist of evidence that tends to show that sexual exploitation of a child, in violation of Section 311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years, in violation of Section 311.11, has occurred or is occurring;

☐ there is a warrant to arrest a person;

☐ a provider of electronic communication service or remote computing service has records or evidence, as specified in Section 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in the possession of any person with the intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery;

☐ property or things to be seized include an item or any evidence that tends to show a violation of Section 3700.5 of the Labor Code, or tends to show that a particular person has violated Section 3700.5 of the Labor Code;

**You are Therefore COMMANDED to SEARCH:**     (premises, vehicles, persons)
See attached and incorporated pages.

**For the FOLLOWING PROPERTY, THING(s) or PERSON(s):**
See attached and incorporated pages.

**AND TO SEIZE IT / THEM IF FOUND** and bring it / them forthwith before me, or this court, at the courthouse of this court. This Search Warrant and Affidavit and attached and incorporated Affidavit were sworn to as true and subscribed before me on this ___19___ day of __July__ , __2022__ , at __10:39__ **A.M. /PM** Wherefore, I find probable cause for the issuance of this Search Warrant and do issue it.

*Katherine Mader.*
*(Signature of Magistrate)*

| | | | | |
|---|---|---|---|---|
| **NON-DISCLOSURE APPROVED:** | ☐YES | ☒NO | **RETURN EXTENSION APPROVED:** ☐ YES | ☒ NO |
| **Pc 1040-1042 SEALING APPROVED:** | ☒YES | ☐NO | **HOBBS SEALING APPROVED:** | ☒ YES ☐NO |
| **PC 1546.2(a) DELAY OF NOTICE APPROVED:** ☐YES | | ☒NO | **NIGHT SERVICE APPROVED:** | ☒ YES ☐NO |

Judge of the Superior Court of California, County of Los Angeles, _Central_ Dept. _43_

*(Signature of Magistrate)*

# SEARCH WARRANT AND AFFIDAVIT

**LOCATIONS TO BE SEARCHED:**

THE PREMISES at 4550 Gable Drive Encino, CA 91316; further described as a single-family residence. The structure is located four lots south of Boris Drive on the east side of the street of Gable Drive 4550 Gable Drive shares a driveway with 4530 Gable Drive. The numbers "4530" in black writing are affixed on a white stucco retaining wall at the beginning of the driveway off Gable Drive. Two black mailboxes are encased in the white, stucco retaining wall. One mailbox has the numbers "4550" in black writing vertically written next to the mailbox. The other has the numbers "4530" in black writing vertically written next to the mailbox. As you drive up the driveway, 4550 Gable Drive is located on the left side and has a brown privacy gate affixed to two stone pillars. On the east pillar, there is a plaque with "4550 Gable Drive" written in black. The first "5" in "4550" is missing.   4550 Gable Drive is a Tucson style villa with yellow stucco/stone and orange/brown Spanish style roof tiles.  The front door to the location is on the south side of the location (front).  There is a clear distinction between 4530 and 4550 Gable Drive ("Target Location").



Photograph obtained from opensource Zillow.com

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT



Photograph obtained on June 23ʳᵈ, 2022 by LAPD Detective Kaminski



Photograph obtained from opensource google.com/maps



STATE OF CALIFORNIA - COUNTY OF LOS ANGELES

# SEARCH WARRANT AND AFFIDAVIT

**AREAS TO BE SEARCHED:**

Areas to be searched at the locations named in this affidavit include, but is not limited to: all rooms, attics, basements, roofs, and parts therein, the surrounding grounds and any garages, storage rooms, trash containers, lockers, files attached and unattached trash area and any outbuildings of any kind located thereon and any combination safes or locked boxes associated with 4550 Gable Drive, Encino CA. The search shall include all outdoor area, such as the backyard and hillside grounds. The search shall include all vehicles specifically connected to occupants or permanent residents of the location that are parked directly on/or nearby the location, be included in this warrant, and are directly linked to the illegal gambling event.

**THE FOLLOWING PERSONS:**

The person known as **Yevgeni "GIORA" GERSHMAN** is described as a Male, White, approximately 46 years of age (date of birth: September 19th, 1975 ), approximately 5 feet 11 inches tall, weighing approximately 198 pounds, brown hair, green eyes.

The person known as **Allan De Guzman AUSTRIA, aka "ELIKA"**, is described as a Male, Philipino, approximately 48 years of age (date of birth: December 3rd, 1973), approximately 5 feet 8 inches tall, weighing approximately 190 pounds, black hair, brown eyes, California Driver's license number F1554528, CII#A08189465.

The person known as **Evgeni "EUGENE" TOUREVSKI**, is described as a Male, White, approximately 45 years of age (date of birth: March 18th, 1977), approximately 6 feet 0 inches tall, weighing approximately 187 pounds, black hair, blue eyes, California Driver's license number D5440223.

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

The person known as **Yarin "YC" COHEN**, is described as a Male, White, approximately 24 years of age (date of birth: March 12th, 1998), approximately 5 feet 10 inches tall, weighing approximately 205 pounds, black hair, blue eyes, California Driver's license number F6998653.

The person known as **Nisim "NINO" HOHASHVILI**, is described as Male, White approximately 38 years of age (date of birth: July 30th, 1983), approximately 5 feet 8 inches tall, weighing approximately 154 pounds, black hair, brown eyes, California Driver's license number E1120540, CII#A26925008.

The person known as **Yaaqov "KOBI" VAKNIN**, is described as a Male, White approximately 42 years of age (date of birth: January 27th, 1980), approximately 5 feet 8 inches tall, weighing approximately 190 pounds, brown hair, green eyes, California Driver's license number F4636846, CII#A38923322.

The person known as **Daniel "COCO" COHEN**, is described as a Male, White approximately 29 years of age (date of birth: June 4th, 1993), approximately 6 feet 0 inches tall, weighing approximately 185 pounds, black hair, hazel eyes, California Driver's license number E2941608.

The person known as **TOMER Daniel**, is described as a Male, White approximately 38 years of age (date of birth: May 23rd, 1984), approximately 6 feet 0 inches tall, weighing approximately 188 pounds, black hair, brown eyes, California Driver's license number D1616898, CII#A32016221.

The person known as **Gilbert ARENAS**, is described as a Male, Black approximately 40 years of age (date of birth: January 6th, 1982), approximately 6 feet 4 inches tall, weighing approximately 191 pounds, black hair, brown eyes, California Driver's license number B9553472, CII#A22922790.

## STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

The person known as **Arthur KATS**, is described as a Male, White approximately 48 years of age (date of birth: April 17th, 1974), approximately 5 feet 10 inches tall, weighing approximately 190 pounds, gray hair, brown eyes, California Driver's license number A6686238, CII#A10077453.

For the reasons that individuals who are present at gambling locations are commonly involved in illegal gambling and/or assisting in the operation of the gambling location (i.e. players, dealers, working girls, cooks, valets, security, etc.), your Affiant requests the search includes any person at (or associated with) the location at the time of service/execution of this search warrant. Additionally, through your Affiant's training and experience, persons who attend illegal gambling locations are known to carry illegal drugs and firearms. The searching of all people present at the location is further to protect the safety of those officers participating in the warrant.

Further, it is my opinion that only persons who are known to participate in and/or assist in the operation of the illegal gambling location are trusted with the knowledge of the activity within the location and are allowed to enter the residence. Therefore, I am asking to search any person within the residence. Furthermore, based on my investigation I know that the residence is vacant from occupants unless there is an activity associated with an illegal gambling event at the location.

## NIGHTTIME SERVICE REQUEST:

I am also requesting day or night time service endorsement for this warrant. The gambling location is not fully active until past 22:00 hours. The nighttime service would assist with the safety of the officers and public, as allowed under Penal Code 1533.

AS
55915

# SEARCH WARRANT AND AFFIDAVIT

**THE FOLLOWING VEHICLES:**

A **black 2020 Landrover** SUV bearing temporary California license plate No. AY55J75 (the LANDROVER). Associated permanent California license plate 8PRU141. The vehicle is registered to Benjamin Manran 17725 Revello Drive, Pacific Palisades, CA.  Suspect – GERSHMAN has been seen driving this vehicle on numerous occasions between the dates of June 21, 2022 to present date. On July 12th, 2022 at approximately 2001 hours, Investigators were monitoring 24375 Hatteras St, the residence of GERSHMAN, when they observed GERSHMAN exit and enter into the LANDROVER. At approximately 2017 hours, the LANDROVER was then seen pulling into the driveway of 4550 Gable Dr.

A black **2021 Cadillac Escalade** SUV bearing California license plate No. 8ZKU476 (the ESCALADE). The ESCALADE is registered to Galeano Kolbert, 22776 Pacific Coast Highway 5, Malibu, CA.  The ESCALADE has been observed at 22454 Bassett St. which is the residence of Allan AUSTRIA, aka ELIKA. On June 15th, 2022, Investigators were conducting surveillance on GERSHMAN's residence. GERSHMAN was observed entering the ESCALADE and driving away from the location. Shortly thereafter, the ESCALADE arrived to 4550 Gable Dr.

A black **2021 Mercedes S580** bearing temporary California license plate No. CA97U44 (the MERCEDES). Permanent California license plate No. assigned 8ZQP533. The MERCEDES is registered to Elya Naftali 22548 Margarita Drive, Woodland Hills, CA. The MERCEDES has been observed parked at 24375 Hatteras St, the residence of GERSHMAN. Additionally, photographs of the MERCEDES were observed on a cell phone extraction of GERSHMAN's cellphone.

# SEARCH WARRANT AND AFFIDAVIT

1    A blue **2021 Audi A4** bearing California license plate No. 8XPS864 (the AUDI). The AUDI is

2    registered to Evgeni TOUREVSKI 5648 Calvin Ave Tarzana, CA 91356. Evgeni TOUREVSKI is

3    described as a partner in operating the illegal gambling location and the AUDI has been observed

4    entering the premises of 4550 Gable Dr on July 12th, 2022.

5

6    A white **2019 Mercedes** bearing California license plate No. 8MKT096 (the WHITE MERCEDES).

7    The WHITE MERCEDES is registered to Natalie and Yarin COHEN 19034 Friar St Tarzana, CA

8    91335. Yarin COHEN is described as a partner in operating the illegal gambling location and the

9    WHITE MERCEDES was seen entering the residence on July 12th, 2022.

10

11

12   After conducting several surveillances on the location, Investigators observed numerous vehicles

13   pulling into the driveway leading to 4550 Gable Drive Encino, CA or parking on the street in the

14   surrounding area of 4550 Gable Drive Encino, CA.

15

16   It is my opinion that individuals present at illegal gambling locations are involved in the illegal

17   gambling or operation of the gambling location. These individuals use their vehicles to hide narcotics,

18   money, weapons or other contraband to avoid detection from law enforcement and to transport

19   contraband to and from gambling locations. Therefore, I am requesting permission to search any

20   vehicles under the control of persons present at 4550 Gable Drive Encino, CA and to search any

21   vehicles in the gated area, or the surrounding street in front of, or in the area of, 4550 Gable Drive

22   Encino, CA that can be linked to any occupants of 4550 Gable Drive Encino, CA who are directly

23   linked to the gambling operations, as a player, managers, organizers, , visitors or employee (i.e.

24   Security and dealers). I am also requesting to search all occupants inside any vehicles belonging to

25

26

1  individuals living or found inside 4550 Gable Drive Encino, CA.  The search of the vehicles is only

2  associated with the illegal casino operation on the night of July 19-20, 2022.

4  ## FOR THE FOLLOWING PROPERTY:

5  Property to be seized is evidence, contraband, fruits, or instrumentalities of violations of:

6  **330 A PC** – Illegal gambling, **330.1(a) PC** – Possession of a Slot Machine, **25400 PC** – Possession of a

7  concealed firearm, **29800(a)(1)** -  Possession of a Firearm by a Prohibited Person, **11351, 11352 H&S**,

8  **11378, and 11379 H&S** – Possession for Sales, Transportation,  or Furnishing of Narcotics, **186.10 PC**

9  – Money Laundering, **470 PC** – Predatory Lending, **266h** – Pimping , **266i PC** – Pandering , **647(b) PC**

10  – Prostitution, **664/524 PC** Attempted Extortion, **182 PC**- Conspiracy (collectively the "TARGET

11  OFFENSES") namely:

14  Playing cards, betting tables, and records of documents referring or relating to casino games such as

15  poker, wagering or gambling, the rake (commission taken by a cardroom or house), purchasing or

16  cashing out chips or credits, dividing profits or expenses among partners or shareholders, payments to

17  staff for which payroll taxes have not been deducted.

19  Illegal Gaming Machines (slot machines) as defined by Penal Code Section 330b and 330.1, and keys

20  and/or locks associated with the security of the slot machines; items used to operate the slot machine,

21  including but not limited to reels, coin hoppers, coin comparators, coin drop mechanisms, computer

22  chips, mother boards, circuit boards, hard meters; manuals of ownership, manuals of operation and/or

23  manuals of instruction.

# SEARCH WARRANT AND AFFIDAVIT

1  U.S. currency and/or a "Thing of Value," as defined as any money, coin, currency, check, chips,

2  cryptocurrency, allowance, token, credit, merchandise, property or any representation of value used or

3  intended to be used for the purpose of operating and/or sales of the slot machines or other illegal card

4  games.

6  Any receipt book or financial record however maintained, including income statements, cash receipt

7  journals, bank statements, deposit slips, cancelled checks, check stubs, check registers, tax returns,

8  general journals; writings, however maintained, and things used as a means of committing a public

9  offense, namely an illegal gambling business per 330 PC.

12  Documents and records (in print or digital format) referring or relating to strippers, sex workers, or using

13  persons to perform sexual services or persons under the age of 21 to serve alcohol.

15  Documents and records (in print or digital format) referring or relating to card dealers, loan sharking,

16  collections, security, valet, rental of residences and  players.

18  Methamphetamine, powder cocaine, rock cocaine, heroin, marijuana, PCP and its analogs,

19  narcotics paraphernalia, and any other illegally possessed narcotics including: scales and other

20  weighing devices, test tubes and containers of  various types commonly associated with the storage

21  and use of narcotics;  Articles of personal property tending to establish and document sales of

22  narcotics, including US currency, buyer lists, seller lists, and recordation of sales; Articles of

23  personal property tending to establish the existence of a conspiracy to sell narcotics, including

24  personal telephone books, address books, telephone bills, papers, and documents containing lists of

25  names; and articles of personal property tending to establish the identity of persons in control of

# SEARCH WARRANT AND AFFIDAVIT

the premises, vehicles, storage areas or containers where narcotics may be found, including utility company receipts, rent receipts, cancelled mail envelopes, keys, sales receipts, purchase receipts, photographs, vehicle pink slips, and vehicle registration.

Any firearm, any spent caliber/millimeter casings, any miscellaneous gun/firearm pieces, ammunition, gun-cleaning items or kits, holsters, ammunition belts, original box packaging materials, clips/magazines/cylinders/loader devices, targets, expended pieces of lead/bullets, any photographs of firearms, or any paperwork showing the purchase, storage, disposition, and/or dominion and control over any guns, any ammunition, or any of the above items.

Any items tending to establish the identity of persons who have dominion and control of the location, premises, automobiles, or items to be seized, including delivered mail, whether inside the location or in the mail box/s, bills, utility bills, telephone bills, miscellaneous addressed mail, personal letters, personal identification, purchase receipts, rent receipts, sales receipts, tax statements, payroll check stubs, keys and receipts for safe deposit box(s), keys and receipts for rental storage space, keys and receipts for post office box or mail drop rentals, ignition keys, car door and trunk keys, vehicle ownership certificates or "pink slips," and/or vehicle registration slips, recordation of voice transmissions on telephone answering machines, audio tapes and telephone message receipt books, and written phone messages, and photographs tending to show occupation of the residence / business and connection between co-conspirators, whether identified, or unidentified, also digital pagers which will document telephone numbers of co-conspirators, and if found, to activate the digital pagers' display mechanism and to obtain messages from the pagers, answering machines, tape recorders, and any other recording devices, and to play such devices to obtain their messages. Any examples of handwriting including letters, address books, business records, canceled checks, notes, and/or lists.

# SEARCH WARRANT AND AFFIDAVIT

1  Any evidence showing the various roles indivuduals hold in running the illegal gambling establishment,

2  to include, but not limited to: managing, promoting, advertising, collecting, hiring, loan sharking,

3  pimping, prostitution, money laundering, enforcers, and other evidence tending to establish violation of

4  any of the TARGET OFFENSES.

5

6  The court authorizes the search and opening of any safes located inside the location. The search is to be

7  conducted in a manner that minimizes damage as much as possible.

8

9

10  **DIGITAL EVIDENCE:**

11  The scope of the seizure shall include all the persons named above, any person identified to be

12  the dealer, estate manager for Gilbert ARENAS, players, chip runner, working girls or potential

13  clients, and security guard.  The search shall encompass all data generated between June 1, 2021

14  and July 20, 2022 that constitutes evidence of the TARGET OFFENSES to include:

15

16  Any and all electronic data processing and storage devices, computers and computer systems, such

17  as central processing units, internal and peripheral storage devices such as fixed disks, internal and

18  external hard drives, floppy disk drives and diskettes, tape drives and tapes, optical storage devices

19  (including cameras), dongles, encryption keys, personal data assistants (PDAs) or other memory

20  storage devices; and any/all peripheral input/output devices such as keyboards, printers, video

21  display monitors, optical readers and related communication devices such as modems, associated

22  telephone sets, speed dialers, and/or other controlling devices, plotters, software to run programs,

23  connecting cables and plugs, peripherals such as joysticks, mouse, or other input devices, scanners,

24  writing pads, manuals, connecting switches, telephones and telephone cables, and interface

25  devices; system documentation, operating logs and documentation, software and instructional

26  manuals.  Computing or data processing software, stored on any type of medium such as: hard

# SEARCH WARRANT AND AFFIDAVIT

1  disks, floppy disks, CD-Rs, CD-RWs, DVDs, cassette tapes, or other permanent or transient storage

2  medium.

3

4  Any and all records, whether stored on paper, on magnetic media such as tape, cassette, disk,

5  diskette or on memory storage devices such as optical disks, programmable instruments such as

6  cellular phones, telephones, "electronic calendar\address books" calculators, iPhones, iPads,

7  other Smart Phones, other tablet computers, or any other storage media, together with indicia of

8  use, ownership, possession, or control of such records.

9

10  Any and all written or computer communication in printed or stored medium such as E-Mail and

11  Chat Logs, phone text messages, SMS/MMS, attachments, photos, notes, GPS data, GPS geo-

12  location tagging, Voice of Internet Protocol (VoIP) , whether in active files, deleted files or

13  unallocated space on the hard drive, floppy drive or any data storage media communication

14  concerning the Target Offenses  with any of the other suspects or witnesses in this case.

15

16  All location data for the dates above. Location data may be stored as GPS locations or cellular

17  tower connection data. Location data may be found in the metadata of photos and social

18  networking posts, Wi-Fi logs, and data associated with installed applications.

19

20  All photographic/video/audio data and associated metadata, internet histories for the dates above,

21  including cookies, bookmarks, web history, search terms.

22

23  All third party chat application, including WhatsApp, Signal, iMessages, ICQ, Facebook

24  Messenger, Instagram Messenger.

25

26

# SEARCH WARRANT AND AFFIDAVIT

All items used to operate the gambling establishment including but not limited to, Video surveillance camera systems, including the hard drive and cameras. Your affiant requests to review video surveillance on scene. This will assist the investigation and determine the operators and players of the facility and other possible crimes that may have been committed at the location. In order to preserve the evidence from DVR's in the event that data may be deleted when the DVR is powered down, your affiant request to download a copy of the DVR on to a separate hard drive for evidentiary purposes. In addition, your affiant requests to seize the surveillance equipment and hard drives if it is determined that a more thorough investigation is needed. This will assist the investigation of any additional operators, such as the owners, who are not always present on scene, and determine any individuals who may be associated with money pick-ups.

Search of all of the above items is for files, data, images, software, operating systems, deleted files, altered files, system configurations, drive and disk configurations, date and time, and unallocated and slack space, for evidence. With respect to computer systems and any items listed above found during the execution of this Search Warrant, the searching Peace Officers are authorized to seize, and book said computer systems and any items listed above and transfer them to a Law Enforcement Agency location prior to commencing the search of the items.

Furthermore, I request the said search of digital evidence may continue beyond the ten-day period beginning upon issuance of this Search Warrant, to the extent necessary to complete the search on the computer systems and any items listed above. The seized digital evidence may be transferred to and searched by federal, state, or local law enforcement agents or their forensics experts who are part of this ongoing investigation. The scope of the search shall encompass all data generated between June 1, 2021 and July 20, 2022 that constitutes evidence of the TARGET OFFENSES.



# SEARCH WARRANT AND AFFIDAVIT

1   I also request for any and all data from a "cloud" or other off-site computer storage system that is

2   designed to store digital data for any of the persons listed in the FOLLOWING PERSONS

3   section or any persons detained at the location that can be reasonably linked to the involvement

4   of the operation or participation of the gambling house.

6   I also request to use biometric features to unlock digital devices, to include facial, fingerprint,

7   and retinal recognition.

9   **<u>Search Procedure for Digital Devices:</u>**

10  In searching digital devices or forensic copies thereof, law enforcement personnel executing this search

11  warrant will employ the following procedure:

13  Law enforcement personnel or other individuals assisting law enforcement personnel will, in their

14  discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic

15  image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that

16  location.

18  If no evidence of criminal activity is discovered relating to the seized property and associated

19  peripherals the system will be returned as soon as possible.

# SEARCH WARRANT AND AFFIDAVIT

**EXPERTISE:**

Your affiant, Detective Daniel Kaminski, Serial No. 40821, is a sworn peace officer for the City of Los Angeles and has been so employed since August of 2011. I am currently assigned as a Detective of the Los Angeles Police Department's Major Crimes Division, Transnational Organized Crime Section. The mission of the Section is to investigate any instances of organized crime throughout the city and gather intelligence on criminal organizations, and their members, who operate within the city of Los Angeles. In addition to practical investigative experience, I have worked with and spoken to senior detectives to learn proper investigative protocol about crime scene investigation, evidence preservation, interviews, and interrogations. I have also spoken ith other organized crime detectives with vast experience in illegal gambling, loan sharking, money laundering and extrotions. I have served a number of search warrants where digital evidence was seized and processed for evidence.

I was previously assigned to the Los Angeles Police Department's, Northeast Division Gang Enforcement Detail for five years. During this time, I investigated or assisted in the investigation of numerous gang related crimes including, but not limited to, vandalisms, robberies, assaults with a deadly weapon, and homicides. I have testified as a court qualified gang expert, in a preliminary hearing and trial setting, for the Avenues, Cypress Park, Dogtown, and Highland Park criminal street gangs. I have attended the LAPD Basic Gang Awareness training, Institute of Criminal Investigators Gang Investigations training, California Gang Investigator Association gang conference, California Gang Task Force gang conference, Anatomy of a Gang Homicide training, and California Robbery Investigators Association conference.

## STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

Further, I have received formal training in the recognition of narcotics and narcotics for possession, possession for sales, packaging, and sales through Police Officers Standard Training (P.O.S.T.) accredited courses by the Los Angeles Police Academy. I have also completed the Los Angeles Police Department 5-day narcotics school. I have attended the Drug Enforcement Agency (DEA) southwest laboratory where a DEA chemist conducted an actual live cook of methamphetamine from pseudoephedrine using the hydriodic acid reduction method with iodine and red phosphorous. I have testified as a court qualified narcotics expert for possession of sales of methamphetamines, cocaine, marijuana, and morphine pills.

I have participated in the service of multiple search warrants at known illegal gambling locations where I have assisted with the apprehension and interview of Suspects, as well as the collection of evidence. I have spoken to multiple individuals who frequent and/or participate in playing games at several different illegal gambling locations. They have described to me standard operation and set up of these illegal gambling locations. My formal education consists of a bachelor's degree in Criminal Justice and a Master of Business Administration.

**BEGINNING OF CONFIDENTIAL HOBBS SECTION**



# SEARCH WARRANT AND AFFIDAVIT

**STATEMENT OF PROBABLE CAUSE:**

1
2   The information set forth in this affidavit is based upon my participation in the investigation,
3   encompassing my personal knowledge, observations and experience, as well as information
4   obtained through my review of evidence, investigative reports, and information provided by
5   others, including other law enforcement partners.  As this affidavit is being submitted for the
6   limited purpose of securing the requested warrant, I have not included each and every fact known
7   to me concerning this investigation.  I have set forth only the facts that I believe are necessary to
8   establish probable cause for the requested warrant.
9

10  **SEARCH WARRANT AT 13359 CHANDLER BOULEVARD:**
    On January 26th, 2022 Federal Agents, in conjunction with the Los Angeles Police Department, served a
11  search warrant at 13359 Chandler Boulevard Sherman Oaks, CA 91401. The location was a known
12
13  gambling location. During the service of the search warrant, multiple Suspects were detained, including
14  an individual identified as Yevgeni GERSHMAN, with a date of birth of September 19th, 1975.
15

16  Previously, members of the Los Angeles Police Department (LAPD), Major Crimes Division,
17  Transnational Organized Crime Section (TOCS), which your affiant is assigned to, were aware that
18
19  Yevgeni "GIORA" GERSHMAN was an Israeli National and a high-ranking member of Israeli-Russian
    Organized Crime.
20
21
22  During the search warrant on January 26th, 2022 at 13359 Chandler Blvd, an Apple iPhone 12 Max with
23  serial number F2LF56X00D56, was recovered and determined to belong to GERSHMAN. Investigators
24  also recovered multiple loaded firearms, including a "ghost gun", or firearm without a serial number, at
25  the location. Investigators with LAPD TOCS took custody of two firearms and the phone and began
26  conducting a search of the phones content.

# SEARCH WARRANT AND AFFIDAVIT

**CRIME REPORT FILED BY IDAN ASAYAG:**

On March 31st, 2022 Detectives were notified of a crime report taken from Los Angeles Police Departments – North Hollywood Division (DR No. 2215-07343). The Victim – Idan ASAYAG, alleged he was being threatened by individuals for payment on a $1.2 million debt he owed as the result of losses he incurred at an illegal gambling house. ASAYAG alleged one of the individuals threatening him was GERSHMAN, along with his associated, who was later identified to be Allan "ELIKA" AUSTRIA.

ASAYAG stated that he has been involved in playing poker games at illegal "underground" casinos for approximately one year. During that time ASAYAG met Craig FRANZE who rents the residence located at 6447 Weidlake Drive in Los Angeles. FRANZE runs the games at the location with the assistance of other associates, which includes, but is not limited to, MIKE, a different Mike (aka "MEATBALL"), GERSHMAN, and ELIKA.

ASAYAG described MIKE as FRANZE's business partner who rents the residence at 6447 Weidlake Dr with FRANZE. ASAYAG described MEATBALL as a heavy-set M/H who is from Miami. MEATBALL is involved in setting up the games with FRANZE at the location. ASAYAG described GERSHMAN as a high-ranking Israeli organized crime gang-member, from the Tansky Organized Crime Family, who acts as the muscle for these illegal gambling houses. ASAYAG described ELIKA as a heavy-set Male, possibly of Hawaiian descent, who assists GERSHMAN as muscle for the illegal gambling houses.

ASAYAG described a typical night at the gambling house to have two poker tables with approximately nine players at each table. ASAYAG stated that there are women, alcohol, drugs, and guns readily available at the houses. Typically, a $15K buy-in is required to enter the games and ASAYAG states

# SEARCH WARRANT AND AFFIDAVIT

that cash is rarely exchanged at the table but rather players play on marker. A marker is an interest free line of credit that players can draw to gamble without handling large amounts of cash. At the end of the night, a tally is conducted on each player to determine how much he/she owes or is owed. ASAYAG stated that players rarely default on a payment out of fear of GERSHMAN and ELIKA.

ASAYAG stated on or around the last Friday of August 2021, he was playing a game at 6447 Weidlake Dr. that was organized by FRANZE. During the course of the game, ASAYAG noticed odd betting/calling plays from FRANZE which was winning him a large amount of money. At one point, ASAYAG counted the deck of cards the table was playing with and noticed that there were only 50 cards with the two missing cards being Aces. ASAYAG stated he continued to pay and take out markers because he believed he would be able to win money regardless of the possible cheating going on and he knew he would not pay back the marker if he did lose by accusing FRANZE of cheating. ASAYAG estimated that night MEATBALL won $80K, FRANZE won $600K, a player named "DAZO" won $500-$700K and the house took home $150K.

After losing the $1.2 million, ASAYAG flew out the next day with his family to Israel, where his parents live. While in Israel, ASAYAG worked out a deal to pay FRANZE $6K a month for 30 months to resolve his debt. ASAYAG relayed this deal to his friends NINO and KOBI around the dates of October 15th- 18th 2021, and arranged for NINO to pay FRANZE on or around October 29th – 30th. ASAYAG stated that NINO contacted ELIKA and advised him that a deal had been arranged between ASAYAG and FRANZE. NINO then attempted to deliver the first payment to FRANZE at a game. Upon attempting to make the delivery, FRANZE, who was accompanied by GERSHMAN and ELIKA, turned down the payment stating that it was a bad deal that needed to be renegotiated.

# SEARCH WARRANT AND AFFIDAVIT

ASAYAG advised that on or around November 19th, 2021, while he was still in Israel, he began receiving threats from various Israeli members of a criminal organization, who were sent by GERSHMAN, stating they were sent by FRANZE and MIKE to collect money. ASAYAG, in fear for his safety the the safety of his family, was being purposefully vague and extremely apprehensive in providing information on the individuals in Israel. ASAYAG stated he believed that because he was no longer in Israel, those threats were no longer pertinent, and he would be too afraid to speak about who and what occurred. ASAYAG did say that on or around December 15th, 2021, he was called to a meeting with Israeli members of a criminal organization. During the meeting, ASAYAG was told he needs to pay $600-700K to resolve his debt. ASAYAG left the meeting, went home, packed his belongings and went straight to the airport. ASAYAG left his vehicle behind in case he was being tracked. Detective Shinfeld asked him if the individuals that called the meeting were members from the Musli crime group and he replied, "no comment." We believe that ASAYAG was afraid to confirm the involvement of the Musli crime group out of fear of retribution. The Musli crime group is the single largest and one of the most violent organized crime groups in Israel. They are known for engaging in murder, car bombings, and extortion rackets throughout the world as a tool for intimidation and control.

On or around December 15th, 2021, while at the airport, ASAYAG spoke on the phone with FRANZE. During the calls, FRANZE denies having anyone sent to collect the debt ASAYAG owes.

Upon leaving Israel, ASAYAG went to New York City and stayed with a friend, Amit SHOOSHAN. ASAYAG believes that no one knew he had flown back to the United States. On or around December 19th, 2021, FRANZE called SHOOSHAN while ASAYAG was with him and ASAYAG recorded the conversation. During the conversation FRANZE claims the situation has resolved and ELIKA has called everyone off and ELIKA, FRANZE, and ASAYAG need to sit down and come to an agreement so

Case 2:22-mj-03396-DUTY Document 13/12/22 Filed 08/23/22 Page 106 of 74 Page ID #:159

everything can be over. FRANZE stated he would contact ASAYAG. ASAYAG states he has not heard from FRANZE, but the threats have continued.

ASAYAG then provided three additional recorded phone calls which took place between SHOOSHAN and KOBI. These phone conversations were conducted in Hebrew.

Both SHOOSHAN and KOBI are friends to ASAYAG. KOBI called and advised that on or around January 20th, 2022, GERSHMAN approached KOBI and told him to call ASAYAG and tell him what was going to happen if he did not pay his debt. According to ASAYAG, GERSHMAN told KOBI that one of ASAYAG'S kids would be kidnapped and/or a grenade would be thrown at his residence. During their conversation, KOBI asked GERSHMAN what if ASAYAG recorded their conversation. GERSHMAN then told KOBI to call SHOOSHAN and relay the threats to SHOOSHAN to relay to ASAYAG. In fear of possibly having to testify against GERSHMAN one day, KOBI contacted SHOOSHAN and ASAYAG and told them to record his conversation when he called back. This way, if asked, he could simply state he was doing what GERSHMAN asked.

Shortly after GERSHMAN had KOBI contact SHOOSHAN to contact ASAYAG, KOBI was at a poker game with GERSHMAN. GERSHMAN called KOBI into a back room where there were approximately five M/H gang members with tattoos on their face with ELIKA present. GIORA told KOBI to contact ASAYAG. KOBI contacted ASAYAG but he did not answer. KOBI left a voicemail message for ASAYAG.



# SEARCH WARRANT AND AFFIDAVIT

### SEARCH OF GERSHMAN'S CELL PHONE:

During the search of GERSHMAN's phone, your affiant discovered several conversations indicating that GERSHMAN was involved in the facilitation, and operation, of illegal gambling locations. Specifically, GERSHMAN was communicating with several females in attempts to have them "work" his games.

One such conversation occurred on January 26th, 2022, GERSHMAN had a conversation with an individual saved under contact name "Джорди La" (Russian writing as GERSHMAN's native language is Russian). In the conversation the party identified themselves as "Jordi". On January 26th, 2022 at 4:35:38 PM (UTC) Jordi messaged GERSHMAN stating "Hey love it's Jordi I just wanted to get the info for tonight's game and double check that Monika and I are both good to work?" GERSHMAN responded "Hi love what's up Yes we have a game in o'clock 930 come". Jordi replied "Address?" to which GERSHMAN replied "13359 Chandler Blvd.". That evening, Federal Agents served a search warrant at the address of 13359 Chandler Blvd. Along with GERSHMAN, a Jordan Natalie RODGER with a date of birth of January 3rd, 1991 and a WA driver's license No. 1NZ63F958 was detained at the location.

In a separate conversation with contact "Вива 2", GERSHMAN sent a photograph depicting a clear plastic baggie containing a white powdery substance resembling cocaine sitting on a wooden table. In a conversation with contact "Элика", whose phone number is associated with ELIKA, there is conversation containing photographs and screenshots of pills identifying them as Xanax and Zolpiden

Also, on the cell phone, Detectives discovered videos depicting gambling occurring at apparent residences. In a WhatsApp conversation with contact "Пжел" GERSHMAN received a video depicting

# SEARCH WARRANT AND AFFIDAVIT

several males sitting around a poker table with casino chips in front of them. As the video scans the

location, you see several females walking through the location, dressed provocatively, in addition to

more poker tables and apparent players. After having viewed this video, investigators believe the

location is 6447 Weidlake Drive Hollywood, CA.



In addition to the evidence of hiring females to "work" potential "games" and videos of apparent illegal

gambling locations, there is evidence of several marker sheets or pay sheets in a conversation between

GERSHMAN and a contact listed as "Кадабрик". These marker sheets show expenses, rake amount,

players wins and losses, and portions the operators "YC", "ELICA", "GIORA", and "EUGEN" earn.



# SEARCH WARRANT AND AFFIDAVIT



While analyzing the phones content, Your affiant discovered multiple possible addresses being utilized as illegal gambling locations. One such address was 4550 Gable Drive, which is mentioned on multiple occasions between several different contacts and GERSHMAN. While meeting with ASAYAG, he advised that GERSHMAN's new casino location was on Gable Drive and met on Tuesday evenings.

While reviewing the chat conversations on GERSHMAN's cell phone I discovered a WhatsApp conversation with contact "Шшшш" from November 27th, 2021. Шшшш's phone number is 972508683597. Investigators discovered the phone number country code for Israel is +972, indicating this phone number is associated with someone with an Israeli phone number. Investigators reached out to Israeli National Police to assist in the investigation and discovered the phone number is associated with ALIK "Oleg" Kovaliov. Since this conversation, ALIK has been detained in prison. In the conversation, GERSHMAN shares a contact, 818-259-9664, which is the phone number ASAYAG utilizes for his WhatsApp contacts. Later in the conversation, GERSHMAN shares two photographs. After reviewing the photographs, I discovered they were pictures of ASAYAG.

# SEARCH WARRANT AND AFFIDAVIT



Based on this information, it is your Affiant's expert opinion that GERSHMAN was providing ASAYAG's contact information and images so people in Israel could reach out and find him. Furthermore, the time period this information was shared, coincides with the time period ASAYAG had retreated to Israel after having lost $1.2 million in an illegal gambling game.

## SECOND INTERVIEW WITH ASAYAG:

Based on the information gleaned from the cell phone, specifically his photographs and contact information being shared with individuals, Investigators scheduled a second interview with ASAYAG. During the meeting, Detectives presented ASAYAG with the photographs from above. ASAYAG reviewed the photographs and identified himself as the individual in the photos. The photograph depicting ASAYAG with a female was a previous Facebook profile picture of ASAYAG's. ASAYAG could not remember where the other photograph was from.

ASAYAG confirmed GERSHMAN currently runs a poker game on Tuesday nights at 4550 Gable Dr. ASAYAG stated the owner of the house is former National Basketball Association player Gilbert ARENAS. ASAYAG stated he believes the handler of the residence is named "Arthur". Additionally, he

# SEARCH WARRANT AND AFFIDAVIT

states that NINO runs a game at the same address on Monday's. NINO spends part of his time in Miami, FL but attends his games every other week to monitor.

ASAYAG stated GERSHMAN runs his poker game with three partners: EUGENE, "YC," and ELIKA. GIORA, YC, and EUGENE each get 30% of the house profits while ELIKA receives 10%.

ASAYAG identified YC as "Yarin Cohen". YC is the younger brother of Daniel "COCO" Cohen who is a regular player at the high stakes poker games.

ASAYAG also showed us a photograph of GERSHMAN's wife, who lives with him and their child in the Los Angeles area.  ASAYAG claimed that GERSHMAN married someone, other than his wife, who has U.S. citizenship in order to establish residency in the U.S.

Previously, ASAYAG was contacted by a friend named "CEDRIC" who advised that a "Mexican Guy" had contacted him stating he wanted to meet with ASAYAG and that he had seen ASAYAG and his kids a few weeks prior. ASAYAG provided the unknown M/H name as "PEEWEE". Based on information obtained from GERSHMAN's cell phone, PEEWEE was identified as Luis SANTOS, who is a documented Canoga Park Alabama gang member who goes by the moniker of PEEWEE. ASAYAG has never met/talked to PEEWEE.

**SURVEILLANCE OF 4550 GABLE DRIVE:**

On Tuesday, May 17th, 2022, your Affiant, and additional LAPD and Homeland Security Investigations (HSI) personnel, conducted a surveillance operations  at the location of 4550 Gable Drive. During the operation, Investigators observed activity consistent with the operation of an illegal gambling house. Numerous high-end vehicles arrived to the location between 1930-2200 hours, several females were

# SEARCH WARRANT AND AFFIDAVIT

1   dropped off in apparent Uber/Lyft vehicles, and valet and security personnel were observed. Most

2   vehicles pulled into the driveway of the location, but several were also parked outside on the

3   surrounding areas of Gable Drive. It appears that a person who was employed as a valet at the location

4   was respositioning vehicles, parking some of the vehicles on the street.

5

6   On Tuesday, June 15th, 2022 Investigators conducted an additional surveillance operation at 4550 Gable

7   Dr. Simultaneous to the surveillance operation, Investigators were monitoring a live camera feed of

8   24375 Hatteras Street, Woodland Hills, CA. This address was established to be the home residence of

9   GERSHMAN. While viewing the live camera, investigators observed a black Cadillac Escalade,

10  equipped with California license plate No. 8ZKU476. Investigators observed GERSHMAN enter the

11  vehicle and drive away from the location. GERSHMAN was the sole occupant of the vehicle. A short

12  time later, the same Escalade arrived to 4550 Gable Drive and drove up the driveway to the location.

13  Investigators again observed activity consistent with the operation of an illegal gambling location,

14  including: several high-end vehicles coming and going from location, females arriving to location, valet,

15  and security. While conducting surveillance, investigators observed an individual believed to be security

16  armed with a firearm.

17

18

19  On Tuesday, July 12th, 2022, Investigators conducted additional surveillance at 4550 Gable Dr.

20  Simultaneous to the surveillance operation, Investigators were monitoring a live camera feed of 24375

21  Hatteras Street, the residence of GERSHMAN. At approximately 2001 hours, GERSHMAN was

22  observed entering the LANDROVER and leaving his residence. Investigators conducted an Apple Maps

23  GPS between 24375 Hatteras Street abd 4550 Gable Drive and discovered it was an approximate 18

24  minute drive. At 2017 hours, Investigators observed the LANDROVER pull into the driveway and enter

25  the gate into the property of 4550 Gable Dr. Investigators again observed activity consistent with the

operation of an illegal gambling location, including: several high-end vehicles coming and going from location, females arriving to location, valet, and security.

## INTERVIEW WITH JACOB KHORRAMIAN:

On July 7th, 2022 at approximately 1630 hours, Investigators met with Jacob KHORRAMIAN, who stated he was fearful of his and his family's safety due to gambling debts he owed. KHORRAMIAN elaborated that he owes several debts to different people over his gambling losses, however, he took two separate "loans" from individuals who have insinuated harm if he does not pay them back.

KHORRAMIAN began gambling at illegal gambling homes in, or around, November 2021. Prior to gambling, KHORRAMIAN worked as a "chip runner" at the illegal gambling houses.
KHORRAMIAN's job duties included providing chips to the players who entered the premises. He would then keep track of the pay sheets, provided by an individual running the games, and distribute the winnings to players and tips/payments to the employees (females, cooks, bartenders, dealers, etc.) at the end of the night.

Through his experience working and playing at these games, KHORRAMIAN stated the house would "rake" $200 per pot and expenses for the night would range from $5,000 - $6,000. Players were able to play "on marker" or "credit" if they were known to the house. If the individual was not known, they had to pay "cash in, cash out" meaning they had to provide the cash upfront and at the end of the night cashed out their chips for cash.

If a player played on marker, they had one week to pay their debt. You would typically pay who would run the game. If you were paying with cryptocurrency, they would send you a cryptocurrency account

# SEARCH WARRANT AND AFFIDAVIT

number for you to forward the funds to. KHORRAMIAN stated this could be the individual who runs
the house, or an individual winner of the game. KHORRAMIAN provided us with a screen shot of a
cryptocurrency payment he made from illegal gambling losses on January 26th, 2022. KHORRAMIAN
provided the full recipient account number as: 0xb66BcA55f5E35ad5b437C1BB0F7c2eb6F0430d8C.

When KHORRAMIAN started playing, he was attending four games a week and losing approximately
$40,000 a week. KHORRAMIAN found himself in gambling debt around February 2022.
KHORRAMIAN stated he was borrowing money from friends and family to pay for debts he owed to
two people he feared.

While playing a game hosted by Yaaqov "KOBI" VAKNIN on, or around, the end of April 2022,
KHORRAMIAN lost $40,000. Unable to pay for his losses, KHORRAMIAN was advised by Nisim
"NINO" HOHASHVILI that he (NINO) could secure him a loan from an individual in Miami named
"SHIMON". KHORRAMIAN had to pay SHIMON, through NINO, $1,500 a day interest on his
$40,000 loan. KHORRAMIAN paid the interest for 10 days before borrowing $5,000 from a friend, and
$10,000 from his parents to bring the principle loan amount to $25,000. He then paid $1,000 for seven
days before borrowing $25,000 from an individual identified as Tony MERCEDES to pay the remaining
balance of the loan. KHORRAMIAN stated MERCEDES dropped off the $25,000 in cash at his office.
KHORRAMIAN stated MERCEDES is a celebrity who has won Grammy awards for his work as a
publisher/producer.

KHORRAMIAN borrowed the money on, or around, May 1st, 2022 owing 10% interest payment per
month ($2,500) for the loan. Since borrowing the money KHORRAMIAN has not made any payments
to MERCEDES. KHORRAMIAN's lack of payments infuriated MERCEDES, who contacted

# SEARCH WARRANT AND AFFIDAVIT

KHORRAMIAN and told him that he sold his debt, and if he (MERCEDES) were him (KHORRAMIAN) he would never go back to his (KHORRAMIAN's) office again. KHORRAMIAN understood this statement as a threat to his safety.

The second loan KHORRAMIAN is worried about is a $150,000 loan he owes someone he identified as "GIORA". I provided a photograph to KHORRAMIAN which was retrieved from a cell phone recovered from Yevgeni "GIORA" GERSHMAN during a search warrant on 1/26/2022. KHORRAMIAN viewed the photograph and identified the individual as the same "GIORA" as he was referring to.

KHORRAMIAN took three separate loans of $50,000 each from GERSHMAN in December 2021, January 2022, and February 2022. The purpose of the loans was to pay back a debt he owed to NINO. KHORRAMIAN was responsible for paying 5% interest a month ($7,500). KHORRAMIAN has paid the interest, every month since February 2022, totaling $37,500. However, KHORRAMIAN is no longer able to pay the loan amount.

On July 6th, 2022, at approximately 2000 hours, KHORRAMIAN stated he went to GERSHMAN's residence, located at 24375 Hatteras St Woodland Hills, CA. Upon arriving he met with GERSHMAN in his backyard. KHORRAMIAN advised GERSHMAN lives at the residence with his wife and child. During the meeting, GERSHMAN advised KHORRAMIAN he better pay his interest amount ($7,500) by Monday, July 11th, 2022 "or else." KHORRAMIAN interpreted this statement as a threat to his safety.

**SW & A1**

# SEARCH WARRANT AND AFFIDAVIT

1   *Note: Investigators have a pole camera monitoring GERSHMAN's residence located at 24375 Hatteras.*

2   *While reviewing the cameras, on July 6th, 2022 at approximately 2001 hours, KHORRAMIAN is seen on*

3   *the video walking towards GIORA's residence. At approximately 2014 hours, KHORRAMIAN is seen*

4   *walking away from GIORA's residence.*

5

6   KHORRAMIAN described GERSHMAN as a Russian Mobster. He stated illegal gambling houses are

7   suffering everywhere because people are not paying their debts. However, KHORRAMIAN stated

8   GERSHMAN's game is still going strong because people are afraid to not pay at his games due to the

9   violent reputation that follows GERSHMAN.

10

11

12   KHORRAMIAN stated GERSHMAN hosts a game at 4550 Gable Dr. Encino, CA on Tuesday

13   evenings. GIORA is partners at these games with ELIKA (323-599-6801) and EUGENE (818-201-

14   8498), who he identified via their California Driver's license photographs, as Allan "ELIKA"

15   AUSTRIA and Evgeni "EUGENE" TOUREVSKI.

16

17   GERSHMAN also recently became partners in an additional game on Thursday nights with Yaaqov

18   "KOBI" VAKNIN and EZRA. KHORRAMIAN identified KOBI via his California Driver license

19   photograph. KHORRAMIAN stated KOBI lost a significant amount of money at one of GERSHMAN's

20   games and to pay him back, he allowed him to become partners on his Thursday night games and earn a

21   percentage of the profits. KHORRAMIAN stated these games are either hosted at 5446 Fulton Avenue

22   or 4550 Gable Drive.

23

24

25   KHORRAMIAN  stated a lot of "poker girls" attend GERSHMAN's games because his game is the only

26   one that can currently pay them for their work. GIORA takes a 25% cut from the tips the girls receive

# SEARCH WARRANT AND AFFIDAVIT

throughout the night. KHORRAMIAN stated the women are at the game to provide "companionship" for the players and attendees. He has knowledge these girls do perform sexual favors in exchange for money or chips.

Additionally, the illegal gambling houses typically have a "coke room" designated for individuals wishing to ingest narcotics, typically cocaine. KHORRAMIAN stated there is an individual who brings the narcotics to distribute, however, he did not know specifically who that individual was. Additionally, people bring their own narcotics to ingest.

KHORRAMIAN knows that 4550 Gable Drive belongs to former NBA basketball player, Gilbert ARENAS. KHORRAMIAN has seen him several times at illegal gambling houses. Recently, KHORRAMIAN states ARENAS does not play because he lost all his money. KHORRAMIAN states the rental for the house is $2,000 a night and ARENAS has his associate, Arthur, "run" or operate the house on his behalf.

KHORRAMIAN is aware that GERSHMAN has armed security at his gambling house. Attendees are also patted down by security to conduct a check for weapons.

KHORRAMIAN has knowledge there was an individual named IDAN who owed $1.2 million to Craig FRANZE. FRANZE use to be a player with a lot of money, but he suddenly stopped paying people. FRANZE was running a gambling location at 6447 Weidlake Ave in the Hollywood Hills which KHORRAMIAN referred to as "the glass house". At one of these games, IDAN lost $1.2 million to FRANZE. IDAN refused to pay so FRANZE sold his debt to GERSHMAN.



STATE OF CALIFORNIA - COUNTY OF LOS ANGELES

# SEARCH WARRANT AND AFFIDAVIT

Your affiant believes that due to a pattern of criminal behavior that has been exhibited by Evgeni 'GIORA' GERSHMAN in the recent past, Investigators observations during surveillance operations, ASAYAG's statements, and information received from GERSHMAN's cell phone, there is fair probability that the items to be seized in connection with the aforementioned crimes are likely to be found in the residences and/or vehicles associated with 4550 Gable Drive Encino, CA.

**END OF CONFIDENTIAL HOBBS SECTION**

**<u>My Expertise Regarding Items to be Seized from a Criminal's Residence, Vehicles, Storage Locations, Safes Person and Digital Device:</u>**

Based on my training and experience, I know that people involved in criminal activities store evidence of their criminal activities, and the proceeds from their criminal activities, at various locations over which they exercise dominion and control. In this case the suspects, Yevgeni GERSHMAN and others were identified to be involved in operating illegal gambling establishments and violating the listed TARGET OFFENSES. We have interviewed several individuals with intimate knowledge of the gambling operations, and conducted surveillance of the suspects and have seen them engaged in conduct that appears to be consistent with behavior indicicating the operation of an illegal gambling residence.

Based on my training and experience I know that a criminal's residence, storage space, digital device, vehicle and on their person are some of the primary locations I have found evidence of criminal activity. In this regard, I know that:



# SEARCH WARRANT AND AFFIDAVIT

People involved in criminal activities often maintain evidence, including those items I have listed in "the Following Property" section (incorporated by reference), at their residences, inside of storage locations or safes, on their persons or in their vehicle so that they have fast and convenient access to items. Further, because people involved in criminal activities are unlikely to store the bulk of their assets (proceeds from criminal activities) in safe locations like banks, they are able to protect their assets by keeping them close at hand in places like their residences, their vehicle and on their person.

People involved in criminal activities maintain, financial records, money orders, gift cards, books, records, customer's lists, receipts, notes, ledgers (often referred to as "pay/owe" sheets) and other papers, for extended periods of time, relating to acquisition and distribution of assets from their illegal activities. These types of records would help prove a case as it relates to the TARGET OFFENSES .

People involved in criminal activities often maintain evidence of their criminal activities on their computers, cellular telephones, and other digital devices. They do this because digital devices can hold substantial amounts of information in very compact locations. Further, storing evidence of criminal activities on digital devices such as cellular telephones, computers, iPads etc. provides an advantage to the criminals as they are often able to lock the devices and protect the evidence of criminal activity from being observed by law enforcement officer. In this investigation one of the Suspects cell phones has already been recovered in a previous search warrant and it has yielded substantial evidence of violations of the listed TARGET OFFENSES. Your Affiant believes additional recovery of cellular telephones and other digital devices, will yield fruitful information assisting in the overall investigation.

Based on my training, experience, and conversations with other law enforcement officers who have expertise in the area of digital devices, I know that digital devices commonly consist of electronic data

# SEARCH WARRANT AND AFFIDAVIT

processing and storage devices, with central processing units, internal and peripheral storage devices such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, dongles or encryption keys, personal data assistants (PDA's) or other memory storage devices. They also consist of peripheral input/output devices such as keyboards, printers, video display monitors, optical readers and related communication devices such as modems, associated telephone sets, speed dialers, or other controlling devices, plotters, software to run programs, connecting cables and plugs, peripherals such as joysticks, electronic mice, or other input devices, scanners, writing pads, manuals, connecting switches, telephones and telephone cables, and interface devices. There is system documentation, operating logs and documentation, software and instructional manuals for the computers and computer systems. Computing or data processing software, may be stored on any type of medium such as: hard disks, floppy disks, CD-R's, CD-RW's, DVD's, cassette tapes, or other permanent or transient storage medium and other forms of magnetic media containing computer information. Consequently, these items, and others noted in the Following Property section, are often found in the residences, and businesses of people involved in criminal activities, or on their person. This is particularly true of small digital devices, such as smart phones, cameras, watches, identification documents, checks, credit cards, and the like, which can be easily carried on a criminal's person. This includes fruits of the person's criminal activities. This also includes business records, financial records, and identifications of other people.

I know that people involved in criminal activities often store evidence of their crimes in written or computer communication form that is printed or stored in locations of digital devices that include E-Mail and Chat Logs, whether in active files, deleted files, or unallocated space on the hard drive, floppy drive or any data storage media that is connected to the digital device, including external hard drives. In this case I know that the suspects promote the illegal gambling events by sending

# SEARCH WARRANT AND AFFIDAVIT

individuals or perscpetive players a text invitation, which includes information on the date/time/location of the illegal gambling event. I also know that organizers communicate with partners, working girls, and employees regarding the operations and logistics of the illegal casino.

It is my experience from past cases that searches of digital devices cannot be completed within ten days in which the Search Warrant must be served and the Return to the court. This is due in part to the fact that the Los Angeles Police Department, Major Crimes Division, and their federal, state, or local counterparts that complete the computer search and examinations, have multiple cases working at the same time and it can take several months to complete the search. This is, of course, also the case because digital devices are capable of storing enormous amounts of information, thus necessitating extended examination and analysis time.

I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition. Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

People involved in criminal activities often maintain addresses and telephone numbers of their criminal associates in books, papers, cellular telephones, computers, or other communication devices. People involved in criminal activities also often maintain photographs of themselves and co-conspirators as well as photographs of the items they have obtained through their criminal activities.

# SEARCH WARRANT AND AFFIDAVIT

At this stage of the investigation, investigators have not fully determined how money is exchanged between players and organizers. The amounts of money involved is in the millions of dollars. Reconcilation between players and the house has to involve the U.S. financial systems. Investigators believe that wire transfers payments, checks, and Crypto exchange methods are used. In the process, investigators believe that the suspects are involved in money laundering and various tax code violations.

Your affiant believes that upon service of this search warrant incriminating evidence will be found at 4550 Gable Drive Encino, CA 91316.

## NIGHTTIME SERVICE:

Based on my training and experience as well as LAPD written policy, and state law specifically PC 1533, I know that daytime service typically allow the service of warrants between the hours of 07:00 and 22:00 hours. Any deviation must be reviewed and granted by the magistrate based on "good cause." Based on my training and experience as well as facts and circumstances established in this investigation I know that the location to be searched begins its operation at 20:00. I know that the bulk of the suspects, players and evidence will be present at the location during prime times of 21:00 and 02:00. I also know that in past warrants involving casinos several firearms were recovered at the location. In order to consider the safety for the officers serving the wearrant, safety of the public, I request the approval of nighttime service.

## REQUEST TO SEAL/HOBBS SEALING REQUEST:

The warrant sought pursuant to this affidavit related to an on-going investigation for Illegal Gambling, Possession of a Slot Machine, Possession of a concealed firearm, Possession of a Firearm by a Prohibited Person, Possession of a Controlled Substance for Sales, Transportationof a Controlled Substance, Furnishing of a Controlled Substanbce, Money Laundering, Predatory

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES

# SEARCH WARRANT AND AFFIDAVIT

1  Lending, Pimping, Pandering, Prostitution, Attempted Extortion Criminal Threats and

2  Conspiracy.  It is expected that additional warrants will be sought relating to this investigation.

3  It is requested that the existence of this warrant remain confidential and sealed, pursuant to

4  *People v. Janet Marie Hobbs, (1994), 7 Cal. 4th 948,* and California Evidence Code section 1040-

5  1042, including the "Confidential Hobbs Section" (Pages 17-34), which is incorporated herein as

6  part of this Search Warrant Affidavit.  Furthermore, the suspects in this case are not in custody

7  and the disclosure of the facts listed in the affidavit would jeopardize the investigation, cause the

8  suspects to flee, conceal evidence of the crime and or it will endanger those involved to include

9  the victims, and cooperators in this case.  I ask the court to find good cause to seal the warrant

10 and approve a HOOBS sealing until further order of the court or until the necessity of such a

11 sealing no longer exists.

**SW & A1**